Filed 5/3/16  P. v. Lamb CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>NICHOLAS DWAIN LAMB,<br><br>Defendant and Appellant. | F068633<br><br>(Stanislaus Super. Ct. No. 1442368)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Valli K. Israels, Judge.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Nicholas Dwain Lamb was charged and convicted of committing three robberies (Pen. Code, § 211)**[1]** and one attempted robbery (§§ 664/211) in Stanislaus County, and was sentenced to five years eight months in prison.

Shortly after he was arrested, the court granted defendant's motion to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). He represented himself throughout the entirety of the proceedings, from the preliminary hearing to sentencing, and never requested reappointment of counsel.

On appeal, defendant contends the court committed prejudicial error because it failed to readvise him of his right to appointment of counsel at the arraignment on the information. He also challenges the court's denial of his motion to suppress his postarrest confession, and argues he invoked his right to counsel and the interrogating officer ignored it and kept questioning him. He separately asserts the court erroneously denied his motion to exclude the search of his cell phone, even though the cell phone was searched pursuant to a warrant, and argues the prosecution failed to establish the chain of custody for the device, and the interrogating officer asked for his cell phone number prior to advising him of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Finally defendant asserts the court failed to properly investigate his complaints about the attentiveness of a juror.

We affirm.

## FACTS

### First Wells Fargo Robbery (Count I)

On December 23, 2011, Joseph Orr (Orr) was working at the Wells Fargo branch located inside Save Mart in Patterson. At 6:00 p.m., a man walked up to Orr's station. The man was six feet tall with a slender build. He was wearing a dark shirt, blue jeans,

---

**[1]** All further statutory citations are to the Penal Code unless otherwise indicated.

and a San Francisco Giants cap. His hair was cropped short and he had a goatee. There was clear tape around the tips of all his fingers on both hands.

Orr asked the man how he could help him. The man passed a note across the counter: " 'This is a robbery. Give me all of your money in the drawer. Do it quickly. Do it quietly.' "

Orr was afraid the man might have a weapon even though he did not display a gun. Orr emptied the cash from his drawer, which was just $55, and placed the money on the counter. The man asked if that was it. Orr said yes. The suspect took the money and left the store.

## Second Wells Fargo Robbery (Count II)

On January 31, 2012, Jenni Vasquez (Vasquez) and Orr were working at the same Wells Fargo branch at the Patterson Save Mart. Around noon, a man walked up to Vasquez's teller station. Vasquez testified the man was in his 20's and about six feet tall. Vasquez later told a deputy that the suspect was wearing a hat with a compass insignia similar to the Seattle Mariners baseball team, along with a black jacket, white shirt, and jeans. He had not shaved and had a five o'clock shadow.

Vasquez testified the man handed a note to her, which said to give him the money from the drawer, and do it quickly and quietly and nobody would get hurt. The man did not display a weapon. Vasquez was fearful because she did not know whether he had a gun.

Vasquez handed over $153, which was all the money in her drawer, and pressed the silent alarm button. The suspect asked for her top drawer and she complied. He asked whether she had any $100 bills. Vasquez said no and the suspect left.

As the suspect walked out of the store, Vasquez gave the duress phrase to Orr to indicate she had just been robbed. Orr saw the suspect walk away from Vasquez, and recognized him as the same man who robbed him a few weeks earlier.

**Attempted Robbery at Walmart (Count III)**

On February 9, 2012, Melanie Camacho (Camacho) was working in the money center at Walmart in Modesto. The center was located at the front of the store and handled money orders, check cashing, and bill payments.

At 8:35 p.m., shortly before closing, Camacho was at her station when a man approached and presented a note: "Calmly and quickly give me all of the cash in your drawer and nobody will get hurt."

Camacho read the note and asked the man, "Are you serious?" He said yes. Camacho asked, "Like why would you do that?" The man replied, "Because I need money." Camacho realized that a robbery was "really going to happen" and became nervous and upset. She told the suspect not to look at her because she was going to cry. The suspect replied, "Keep calm. Don't make a scene."

Camacho pushed the button at her station which indicated she was being robbed. Her cash drawer automatically opened, but the man could not see it because it was under the counter. Camacho testified that Walmart's policy was for employees to comply with potential robbers. However, Camacho quickly closed the cash drawer and made the personal decision that she was not going to give any money to him, even though she had $8,000 to $10,000 in her drawer. She "just didn't feel that he was deserving of it."

The suspect asked Camacho what was taking so long. Camacho pushed a button to notify a manager that she needed assistance. Camacho said she needed to ask someone to open her cash drawer. Christy Fried (Fried) and another manager walked to her station. Fried noticed Camacho was scared and had tears in her eyes. Fried saw a man standing at Camacho's station, and asked Camacho what was wrong. Camacho handed the robbery note to Fried. The suspect tried to grab it back. Fried held onto the note. As she read it, the suspect remained for a moment longer and then left the store.

Fried followed the suspect to the parking lot, where he "took off." Fried called security and other store officials to report the robbery and the suspect's location. A

4.

security guard followed the man, watched him get into a black Honda Civic, and obtained the vehicle's license plate number.

Once the incident was over, Camacho broke down in tears because she had been frightened. She felt her life was in danger because the note warned to give the money or "somebody will get hurt." Camacho never saw a weapon, but she was afraid the incident was going to become violent.

Camacho and Fried described the suspect as wearing a white shirt with grey stripes, a black San Francisco Giants baseball cap, with a mustache and a "patch" of beard. He kept his head down and his hat was low on his brow.

## Riverbank Wells Fargo Robbery (Count IV)

On February 17, 2012, Peter DeLeon (DeLeon) was working at the Wells Fargo branch in Riverbank. Around 5:30 p.m., just before closing, a man approached DeLeon's station and presented a note which said to "be calm and to give the money and nobody would get hurt." The man was wearing a baseball cap that was pulled down to cover his eyes.

DeLeon was afraid the man had a weapon because he kept one of his hands in his pocket. DeLeon did not want to risk anyone's life.

DeLeon returned the note to the suspect and gave him the cash in the drawer, which was $537. The suspect calmly walked out of the bank. DeLeon activated the silent alarm and advised his supervisor that he had been robbed. His supervisor instructed DeLeon to try and get the license plate number.

DeLeon ran outside and saw the suspect get into a dark, four-door Honda Civic. DeLeon obtained the car's license plate number.

## The Investigation

The Stanislaus County Sheriff's Department checked the registration for the license plate number used by the suspect in the Modesto Walmart and Riverbank Wells

5.

Fargo robberies. The license plate was for a Honda that was registered to defendant in Fresno.

Sheriff's Detective Hickman obtained defendant's photograph from the Department of Motor Vehicles and compared it with the surveillance footage of the robbery suspect. He believed defendant matched the suspect's appearance.

On February 21, 2012, Detective Hickman used an Internet database called "Accurint" to research defendant's address and phone number. He found a list of addresses and three phone numbers for defendant. He believed the "top" phone number was the most recent.

In the meantime, law enforcement officers received an anonymous tip that, based on the surveillance camera images, "Casey McPherson" looked like the suspect in the Wells Fargo robberies in Patterson. Orr and Vasquez were separately shown a photographic lineup with this person; defendant's picture was not in this lineup. Orr and Vasquez did not identify anyone as the suspect.

Detective Hickman prepared another photographic lineup with defendant's picture and separately showed it to Orr and Vasquez. Orr and Vasquez were again unable to identify anyone as the Patterson suspect.

Orr later testified that while he clearly remembered the suspect's clothing, his facial features other than the goatee were not clear to him. At trial, Vasquez testified defendant looked like the robbery suspect.

DeLeon was shown a photographic lineup that included defendant's photograph. DeLeon did not recognize anyone in the lineup as the Riverbank suspect. He selected someone other than defendant and said that person looked similar to the suspect. At trial, DeLeon identified defendant as the man who robbed him. DeLeon testified that seeing defendant in person reminded him of that day.

Officer Cloward showed photographic lineups with defendant's picture to Camacho and Fried, and asked if they could identify the Walmart suspect. Both

Camacho and Fried identified defendant as the suspect and said they were 100 percent sure.

At trial, Camacho again identified defendant as the Walmart suspect and testified she had a good look at his face during the incident. Fried also identified defendant as the man who tried to rob Camacho.

**Arrest of Defendant**

The Modesto Police Department issued a statewide "information and belief" warrant for defendant's arrest in the Stanislaus County robberies.

Around 5:00 a.m. on February 25, 2012, defendant was arrested in Fresno on the warrant issued by the Modesto Police Department.[2] Defendant had a goatee, and his driver's license said he was six feet one inch tall.

At 7:00 a.m., Modesto Police Officer Peterson picked up defendant in Fresno and drove him to the Modesto Police Department. Modesto Police Detective Munoz testified that when Peterson and defendant arrived in Modesto, defendant was taken to an interview room. Peterson gave Munoz a manila envelope, and said the envelope contained defendant's property. Munoz testified the envelope contained a T-Mobile smartphone. Munoz booked the cell phone into evidence by writing down the serial number on the back of the device and placing an evidence sticker on it.[3]

---

[2] During his postarrest interviews, defendant said he was stopped by the sheriff's department as he left Table Mountain Casino and was driving on Friant Road back to Fresno.

[3] As we will explain, the investigators obtained a search warrant to conduct a forensic search of the cell phone. In issue V, *post*, we will address defendant's contentions that the prosecution failed to establish a chain of custody for the cell phone, Detective Munoz improperly asked for his cell phone number prior to advising him of the *Miranda* warnings, and the contents of the cell phone were improperly searched as fruit of the poisonous tree.

**Detective Munoz's Interview With Defendant**

At 10:00 a.m. on February 25, 2012, Detective Munoz contacted defendant in the interview room. He asked defendant if he wanted something to eat. Defendant said yes. Munoz gave him some food. He asked defendant for identification information, including his address, former addresses, phone numbers, and employment.

Detective Munoz then advised defendant of the *Miranda* warnings, and asked if he would answer questions. Munoz testified defendant gave an affirmative response and it was obvious that he wanted to talk.

Detective Munoz asked defendant about the attempted robbery at Walmart in Modesto. Defendant denied any involvement and said he was at his parents' house in Fresno that day. Munoz told defendant that witnesses obtained the suspect's license plate and the car was registered to him. Defendant initially did not respond, then said it was a case of mistaken identity and the wrong number was written down. Munoz asked if someone else used his car. Defendant said no one else had used his car in the last 30 days. Munoz asked defendant if he had any sports hats. Defendant said he owned a few including a navy blue Seattle Mariners hat.

**Detective Hickman's Interview With Defendant**

Detective Munoz testified he interviewed defendant for about two and one-half hours. Around 12:50 p.m., after Munoz finished, defendant remained in the interview room. Detective Hickman went in to talk to him.

Detective Hickman testified he advised defendant of the *Miranda* warnings. He asked defendant if he understood his rights and defendant said yes. Hickman said defendant was "pretty tired at that point" because he had "been up about 26, 27 hours."

Detective Hickman asked defendant if he would answer questions. Hickman testified defendant was reluctant to talk, but agreed if it was for five or 10 minutes. Hickman asked defendant about his employment history. He then asked defendant about

8.

both Patterson robberies and his whereabouts on those days. Defendant said he was with his family or maybe at a friend's house.

Detective Hickman asked defendant if he was in Riverbank on February 17, 2012, when the Wells Fargo robbery occurred. Defendant said he had only been to Riverbank one time, several years earlier. Hickman told defendant they had identified his license plate from that robbery. Defendant again denied it.

Detective Hickman told defendant that he just wanted the truth from him, and he did not believe defendant. Defendant did not respond. Hickman concluded the interview and told defendant to let the deputies know if he wanted to talk again.

Defendant was booked into jail and held in custody for the entirety of the proceedings.

### THE KERN COUNTY ROBBERIES[4]

In the meantime, Sergeant Jeffrey Saso of the Bakersfield Police Department was separately investigating a series of robberies which had occurred in Kern County. The Wells Fargo branch in Von's grocery store was robbed on January 12, 2012, and the Walmart service center was robbed on February 1, 2012. The suspect in the Kern County robberies used notes which said, "Give me your money. No one will get hurt. Please stay calm." The suspect had a scruffy beard and wore baseball caps.

Prior to defendant's arrest, Sergeant Saso learned about the robberies in Stanislaus County and spoke to Detectives Hickman and Munoz about their investigation. Saso believed there were similarities between the robberies committed in Kern and Stanislaus Counties based on the targets, the suspect's methods, and the description of the suspect's

---

**4** The instant case only involves defendant's convictions for the Stanislaus County robberies. At the time of his conviction, the Kern County charges had not yet been filed against him. In this trial, however, the court granted the prosecution's motion to introduce evidence about the Kern County robberies, and defendant's confession to those crimes, pursuant to Evidence Code section 1101, subdivision (b). Defendant has not challenged this ruling.

9.

car as a black Honda sedan. Saso also learned that similar robberies had occurred in Paso Robles and Gilroy. Saso testified that the cashier at the Bakersfield Walmart looked at a photographic lineup and identified a suspect; defendant was not in this lineup.

On February 25, 2012, Detective Munoz advised Sergeant Saso that defendant had been arrested and identified as the suspect in the Stanislaus County robberies. Saso decided to go to Modesto and interview defendant.

**Sergeant Saso's Interview With Defendant**

Around 1:00 p.m. on February 27, 2012, Sergeant Saso conducted a tape-recorded interview with defendant at the Modesto Police Department.

Sergeant Saso advised defendant of the *Miranda* warnings, showed surveillance photographs of the robbery suspect to him, and asked if he committed the Kern County robberies. Defendant said no. Saso asked if he was the registered owner of a black Honda. Defendant said yes. Saso asked about his financial situation. Defendant said he was pretty broke. Saso asked if anyone borrowed his car. Defendant said no.

Sergeant Saso told defendant that his license plate was written down by a witness in the Modesto robbery, and the same car was in the surveillance video of the Vons robbery in Bakersfield. Saso asked defendant if he had a cell phone. Defendant said he last had it five or six days ago, and "the detective you mentioned has it."[5] Saso told defendant that they could "triangulate" his cell phone and get records of where he had been. Saso also warned that he could face federal charges because he had robbed banks, and the federal sentence would "probably quadruple what would you get for … a Walmart robbery."

Defendant said he already told Detective Munoz that he was with his parents at the time of the robberies. Sergeant Saso said it was good to establish an alibi, but there would be a problem with the cell phone situation.

_____

[5] Defendant was apparently referring to Detective Munoz.

10.

Sergeant Saso encouraged defendant to tell the truth. Defendant said he had a lot of questions and asked why the booking sheet listed three cases for him. Saso said he had been identified in three robberies through photographic lineups. Defendant asked if he would be charged in Bakersfield. Saso said yes, and that he also faced charges in San Luis Obispo, Gilroy, and Tracy, and there were cases "up and down" the valley. Saso said the photographic lineups and "especially the cell phone pinging … kind of where it puts you."

Defendant asked Sergeant Saso if he had already checked his cell phone. Saso said that required a warrant, and Munoz was in the process of obtaining one. Saso asked defendant if he had more questions. Defendant asked Saso to turn off the tape recorder, and he did at 1:15 p.m.

Sergeant Saso testified that while the recorder was off, defendant started to tell Saso that he committed the robberies. Saso asked defendant if he would talk on the record. Defendant agreed.

**Defendant Confesses to the Kern County Robberies**

At 2:44 p.m., Sergeant Saso turned on the tape recorder, and again advised defendant of the *Miranda* warnings. Defendant again said he understood and wanted to talk to him.

During the second part of the interview, defendant admitted that at 6:00 p.m. on January 12, 2013, he robbed the Wells Fargo bank inside Von's grocery store on Coffee Road in Bakersfield. He presented a note to the teller, which said: "Quietly, calmly, give me the cash. I don't want to hurt anybody." He was unshaven, and he wore glasses, a plaid, long-sleeved shirt, and a blue Seattle Mariners cap. He thought the glasses and beard worked well as a disguise. He obtained $911. He was driving his black Honda Civic. Sergeant Saso checked his reports and confirmed the Honda's license plate number, and that it was registered to defendant in Fresno.

11.

Defendant said he drove from Fresno to Bakersfield specifically to commit the robbery, and then drove back to Fresno. Defendant used his cell phone to conduct an Internet search of banks which were open after 5:00 p.m. because he figured it would be easier to get away with a nighttime robbery. He used the cash to pay bills and other debts.

Defendant also admitted that he robbed the Walmart on Rosedale Highway in Bakersfield on at 6:43 p.m. on February 1, 2012. Defendant said he wore a black jacket, a Seattle Mariners hat, and glasses. He had shaved off his beard. He selected Walmart based on an Internet search on his cell phone. He drove his Honda from Fresno to Bakersfield just to commit the robbery. He handed the cashier a note, which said to calmly give him the money and no one would get hurt. He obtained $1,400 to $1,600. Defendant denied that he threatened anyone, and said he was too ashamed to even look at the victims during the robberies. After he left the store, he stopped to buy gas and then drove back to Fresno.

Defendant also admitted he committed robberies in Gilroy, Patterson, and/or Paso Robles.

Defendant said he committed the robberies because he had many bills, he could not pay his rent, and "a lot of stuff snowballed." He borrowed money from his parents and took a loan on his car. He did not use drugs but admitted he gambled. He played blackjack at Table Mountain Casino and gambled on sports, and he "couldn't win." He owed $5,000 in "pressing immediate debt" and $20,000 overall.

At the conclusion of the interview, Sergeant Saso asked defendant if he wanted to add anything. Defendant said, "I've been as forthcoming as I can be," and promised to contact him if he thought of more details. The interview ended at 3:13 p.m.

## DEFENDANT CONFESSES TO THE STANISLAUS COUNTY ROBBERIES

### Detective Hickman's Interview with Defendant

At 10:30 a.m. on February 28, 2013, the day after defendant confessed to Sergeant Saso about the Kern County robberies, Detectives Hickman and Fisher conducted a videotaped interview with defendant at the jail.

Detective Hickman did not read the entirety of the *Miranda* warnings to defendant. Instead, Hickman reminded defendant that he was "still under *Miranda*" and "anything you tell me can be used against you." Defendant said he understood. Hickman asked defendant if he had any questions, or anything that he could take to the district attorney.

> "[Defendant]: *Well I'm still sorta in the dark. Like I don't even have a lawyer.*
>
> "Hickman: Not yet.
>
> "[Defendant]: Anything like that.
>
> "Hickman: Yeah when you go to arraignment…
>
> "[Defendant]: *I'd like some advice before I…*
>
> "Hickman: Right, I understand.
>
> "[Defendant]: *Move forward.*
>
> "Hickman: *Okay, alright. Well I just, I didn't know, if you know. I wanted to double check with you. If think your arraignment is set for this afternoon.*
>
> "[Defendant]: Is it?
>
> "Hickman: I'm not totally sure. Um, usually it's within a couple of days, so…

13.

"[Defendant]:    Alright." (Italics added.)[6]

Detective Hickman said, "You do know you're under arrest for the robberies" in Patterson and Riverbank. Defendant said he knew that. Hickman encouraged defendant to tell the truth to show his true character, and admit if he just made a mistake.

Defendant said he wanted to "lump everything together," including the Modesto and Bakersfield cases. He did not want to "have a bunch of cases" but wanted "like one, get it done." Defendant said he did not want "to be in trials for the next two years," and he did not want to be taken to Kern and San Luis Obispo after that. "I just want to get it over with."

Defendant admitted he had been in Patterson, Gilroy and Paso Robles.

"[Defendant]:    *I just didn't want to say anything because I wanted advice first, but it seems…*

"Hickman:    I understand that.

"[Defendant]:    (Unintelligible)

"Hickman:    Um, that's the only because we can't give you any advice. I can't give you advice on how to help yourself. Okay, now well, I can and can't. *The only advice that I can give you is to just tell me the truth about what happened*." (Italics added.)

Defendant asked if they could tell that something was weighing on his conscience. Detective Hickman said that the tellers were extremely frightened and thought he had a gun, and "that's even something later on if you decide you want to write an apology letter to those folks" for "putting them through that traumatic experience." Defendant asked which one. Hickman said the young lady in the second Patterson robbery was very shaken and frightened. Defendant said the "girl" in Modesto "flipped out" and "lost it" and made him feel "absolutely terrible."

---

[6] In issue III, *post*, we will address defendant's argument that he was not properly readvised of the *Miranda* warnings; and in issue IV, *post*, whether he invoked his right to counsel at the beginning of this interview.

Defendant said he owed money to his parents and friends, and admitted he had committed robberies in Gilroy, Tracy, Modesto, Paso Robles, Riverbank, two in Patterson, and two in Bakersfield. Defendant said he selected locations where he did not know anyone, the crimes would not be reported on the news where he lived, and picked banks that were open late. Defendant said a bank inside a grocery store was less secure and lacked a guard. He parked on the side of the building beyond the scope of a security camera. He wrapped clear tape around the fingers on his right hand to avoid leaving fingerprints, and kept his left hand in his pocket to remind him not to use it.

Defendant said he was "irritated" that he only received $55 from the male teller at the first Patterson robbery and $153 from female teller during the second one. Defendant said he was not armed and did not own a gun. When one of the store clerks refused to give him anything, he simply left the store.

Defendant said he did not feel he could borrow money from his family or friends. He did not keep gambling to repay his debts because "you gotta cut your losses." Defendant stopped committing robberies after the teller chased him to his car following the Riverbank crime.

**Defendant's Apology Letter**

As the interview continued, Detective Hickman thanked defendant for talking about what happened. Defendant replied, "I just needed time to think and reflect." Hickman suggested that defendant might consider writing an apology letter to the victims, especially in the Riverbank and Patterson cases. Defendant asked if it would help him. Hickman said it would clear his conscience so the victims knew it wasn't anything personal against them, and he was just desperate.

Defendant asked if he should write or type the letter. Detectives Fisher and Hickman provided a notepad and pen. Defendant said he just wanted to do "whatever's right." Hickman encouraged him to tell the victims that it was "nothing personal" against them, and it would help him feel better.

Defendant wrote:

"To the cashier/teller that I robbed,

"I am writing this letter to you to let you know that I didn't choose you for any personal reason. I am very sorry for any pain I have caused you and I wish I could take my actions back. Unfortunately, I cannot do that. The only reason why I did what I did was because of complete financial despair. I had nowhere else to turn and many things to pay. Again, you have my most sincere apology. In time I hope you can accept it. I'm sorry."

## Cell Phone Evidence

As noted above, on February 21, 2012, before defendant was arrested, the sheriff's department determined the suspect's car was registered to defendant. Detective Hickman used an Internet database to research defendant's addresses and phone numbers. Also as noted above, Officer Peterson transported defendant to Modesto after he was arrested, and gave Detective Munoz the package which contained defendant's personal property, including a T-Mobile cell phone. Munoz wrote down the serial number and booked the cell phone into evidence.

On February 29, 2012, Detective Fisher obtained a search warrant for the T-Mobile cell phone. Fisher prepared the search warrant using the information about defendant's phone number which Detective Hickman had previously obtained from February 21, 2012, database search. The warrant was for the cell phone's records, and to extract data and conduct a forensic search of the device's contents. The records from T-Mobile identified defendant as the subscriber.

Based on an analysis of call records, cell towers, and cell phone mapping, an expert determined the cell phone was in the area of the Stanislaus County robberies at the dates and times of the offenses. On January 31, 2012, the cell phone connected to a tower in the Patterson area at 11:09 a.m. The tower was near the Patterson Wells Fargo

16.

bank, which was robbed around noon. After that time until 4:00 p.m., the cell phone connected to towers from Patterson to the Fresno/Clovis area.

The expert testified that at 4:42 p.m. on February 9, 2012, the cell phone was in the Delhi area. At 7:38 p.m., it connected to a tower in the Modesto, near the location of Walmart, where the attempted robbery occurred at 8:30 p.m. At 10:59 p.m., the cell phone was back in Turlock. At 8:39 a.m. on February 10, 2012, the cell phone was in the Fresno/Clovis area.

At 6:00 p.m. on February 17, 2012, the cell phone connected to towers in the Modesto area. The Riverbank Wells Fargo was robbed at 5:30 p.m. At 8:39 p.m., the cell phone was in the Fresno/Clovis area.

There were photographic images on the cell phone, which were "selfies" of defendant, and showed him with a goatee. The photographs also showed a black Honda Civic with the same license plate reported by the robbery witnesses, an electronic slot machine, and a San Francisco Giants team logo. The cell phone had been used to search television and news reports about robberies in Modesto, Riverbank, Patterson, Paso Robles, and Bakersfield; bank robbery success rates; whether it was easier to rob a bank or Walmart; Walmart security; bait money; "Stanislaus bank robbery," "Riverbank Wells Fargo," Wasco State Prison, and "white goatee hat."

The cell phone had also been used to send text messages: "I am in a black Civic," on September 10, 2011; references to gambling wins and losses, on November 14, 2011; another message about paying someone and then trying to "win it back," on January 27, 2012; that he was trying to "come up with it," but he got laid off, he had to close an account, and he would bring $314, on January 28, 2012; and asking someone for a loan and having to pay a website, on February 6, 2012.

17.

## DISCUSSION

### I.    Advisement of the Right to Appointed Counsel

Shortly after the complaint was filed, defendant moved to represent himself pursuant to *Faretta*, and the court granted the motion. Defendant represented himself throughout the preliminary hearing, trial, and sentencing hearing, and never requested reappointment of counsel.

Defendant now contends the court committed prejudicial constitutional error because it failed to readvise him of his right to have appointed counsel when he appeared at the felony arraignment after he was held to answer. As we will explain, any error is necessarily harmless given defendant's affirmation of his continued desire to represent himself.

#### A.  Defendant's Faretta Motion

On February 28, 2012, the complaint was filed against defendant, which charged him with three counts of robbery and one attempted robbery. On the same day, the court appointed the public defender to represent him. Defendant remained in custody for the entirety of the criminal proceedings.

On June 28, 2012, defense counsel advised the court that defendant wanted to represent himself pursuant to *Faretta*. The court asked defendant if that was true, and defendant said yes. The court advised defendant that he had a constitutional right to represent himself but it was usually not in a person's best interests to do so.

The court gave defendant a form entitled, "Advisement and Waiver of Right to Counsel" (*Faretta* Waiver), asked defendant to read the form, and called for a recess.

After the recess, the court stated that defendant had initialed and signed the form. The form explained the disadvantages of self-representation, and that the party had the right to an attorney.

18.

"*I understand that I have the right to be represented by an attorney at all stages of the proceedings and, if I do not have funds to employ an attorney, one will [be] appointed for me by the Court at no cost.*"  (Italics added.)

The form further advised defendant that he had the constitutional rights to a speedy trial by jury, subpoena witnesses, cross-examine witnesses, the privilege against self-incrimination.  He had the right to self-representation, but if he represented himself, he had to conduct his defense without the assistance of a lawyer.

The form had a section for defendant to write about his background.  Defendant wrote he was 33 years old, graduated from high school, and completed 40 units of community college.  He had worked in financial management and customer service.  He did not have any legal training, but he had read legal material in the jail's law library.

The form advised of the dangers and disadvantages of self-representation, and that he was responsible for presenting his case through an opening statement, calling and cross-examining witnesses, making legal objections, preparing jury instructions, and a closing argument.  The form advised that it was the court's recommendation that he *accept appointed counsel* instead of represent himself, and "*that if I accept court-appointed counsel, an experience[d] trial lawyer will be assigned to try my case.*" (Italics added.)

The court asked the prosecutor about defendant's pending robbery cases in different counties.  The prosecutor stated the district attorneys in Kern, San Luis Obispo, Santa Clara, and San Joaquin Counties had not yet filed charges against defendant, and they were waiting for the outcome of the Stanislaus County case.  The prosecutor explained defendant had been offered a "global disposition" for all the cases:  He would admit the Stanislaus County robberies for a term of seven years eight months; he would also admit the San Luis Obispo and Santa Clara robberies for concurrent terms; and Kern County would dismiss all charges.  The prosecutor said that if defendant turned down the offer and went to trial, he would advise the other counties "to go ahead and file."

19.

The court asked defendant if he still wanted to represent himself, and advised him that he would not get any special telephone or research privileges. Defendant said he understood and still wanted to represent himself. The court advised defendant that he could hire an investigator, and apply for funds to pay for the investigator.

The court granted defendant's *Faretta* motion.

### B.  Pretrial Hearings

On January 23 and 31, 2013, defendant filed motions to suppress his confession to Detective Hickman.

On February 4 and 8, and March 11, 2013, the court conducted the preliminary hearing, and considered defendant's motions to suppress. The court denied defendant's suppression motions and held him to answer.[7]

### C.  Felony Arraignment

On March 25, 2013, the information was filed charging defendant with three counts of robbery and one count of attempted robbery.

On the same day, the court conducted the arraignment. Defendant appeared on his own behalf, pleaded not guilty, and waived his right to a formal arraignment.

The court did not readvise him of his right to counsel, or that he could request reappointment of the public defender at any time. As we will explain below, defendant contends the court's failure to readvise him at this hearing constitutes prejudicial error.

### D.  Trial

On October 22, 2013, defendant's jury trial began with motions. Defendant represented himself through the trial.

---

[7] In issues II through IV, *post*, we will address defendant's appellate contentions about his suppression motion and whether he invoked his right to counsel.

On October 29, 2013, in the midst of trial, the court discussed the admissibility of the exhibits with defendant and the prosecutor. The court asked defendant if he would stipulate to admit the exhibits. Defendant said yes. The following exchange occurred:

"THE COURT:     Okay. Yeah. And Mr. Hickman [*sic*] is representing himself. He has had the opportunity to get an attorney.

"[DEFENDANT]:   Mr. Lamb.

"THE COURT:     Mr. Lamb is representing himself not Mr. Hickman.[8] Mr. Lamb is representing himself. He has had the opportunity. He is aware. [¶] Mr. Lamb, would you agree? *I mean, you're aware that you can ask for an attorney at any time. You have not requested an attorney to assist you; correct?*

"[DEFENDANT]:   *Yes. Correct.*

"THE COURT:     Correct to everything I've just said?

"[DEFENDANT]:   Correct to all of the above." (Italics added.)

After he was convicted, defendant filed a meticulous and detailed sentencing statement, and cited to numerous aspects of the trial evidence as alleged mitigating factors to support a lower term. At the sentencing hearing, defendant did not raise any objections about representing himself, or claim that he did not know he could have asked for reappointment of counsel. As the court sentenced him, it complimented defendant for behaving "extremely respectfully and you performed a great deal of work. You were prepared, you were polite, and dare I say even likeable."[9]

### E. The Court's Duty to Advise

Defendant contends the court committed prejudicial constitutional error when it failed to advise him that he could request appointment of counsel after he initially requested to represent himself, and when he appeared for the felony arraignment.

---

[8] The court mistakenly referred to defendant as Detective Hickman.

[9] At the sentencing hearing, the prosecutor stated that there were charges still pending against defendant in four other counties.

"The Sixth Amendment right to the assistance of counsel applies at all critical stages of a criminal proceeding in which the substantial rights of a defendant are at stake. [Citation.]  The right to counsel may be waived by a defendant who wishes to proceed in propria persona.  [Citation.]  By such waiver, a defendant surrenders 'many of the traditional benefits associated with the right to counsel.'  [Citation.]  In view of these consequences, a knowing and intelligent waiver of the right to counsel is required before a criminal defendant is permitted to proceed in propria persona."  (*People v. Crayton* (2002) 28 Cal.4th 346, 362 (*Crayton*).)

"A trial court must grant a defendant's request for self-representation if three conditions are met.  First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation.  [Citations.]  Second, he must make his request unequivocally.  [Citations.]  Third, he must make his request within a reasonable time before trial."  (*People v. Welch* (1999) 20 Cal.4th 701, 729.)

The court "must discuss with the defendant the consequences of his decision.  He should at least be advised that:  self-representation is almost always unwise and that the defense he conducts might be to his detriment; *he will have to follow the same rules that govern attorneys*; the prosecution will be represented by experienced, professional counsel who will have a significant advantage over him in terms of skill, training, education, experience, and ability; the court may terminate his right to represent himself if he engages in disruptive conduct; and he will lose the right to appeal his case on the grounds of ineffective assistance of counsel.  [Citation.]  In addition, he should also be told *he will receive no help or special treatment from the court* and that he does not have a right to standby, advisory, or cocounsel."  (*People v. Phillips* (2006) 135 Cal.App.4th 422, 428, italics added.)

"No particular form of words, however, is required in admonishing a defendant who seeks to forgo the right to counsel and engage in self-representation.  ' "The test of a

22.

valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." ' " (*People v. Lawley* (2002) 27 Cal.4th 102, 140.)

Once the defendant has properly waived his or her right to counsel pursuant to *Faretta*, the Sixth Amendment does not require the superior court to "readvise a defendant of his or her right to counsel and obtain a waiver …." (*Crayton*, *supra*, 28 Cal.4th at p. 362.)

> "Federal authority holds that once a defendant gives a valid waiver, it continues through the duration of the proceedings unless it is withdrawn or is limited to a particular phase of the case. 'While it is true that the Sixth Amendment right to counsel applies at all critical stages of the prosecution, including the sentencing stage, it does not follow that once the assistance of counsel in court has been competently waived, a new waiver must be obtained at every subsequent court appearance by the defendant. A competent election by the defendant to represent himself and to decline the assistance of counsel once made before the court carries forward through all further proceedings in that case unless appointment of counsel for subsequent proceedings is expressly requested by the defendant or there are circumstances which suggest that the waiver was limited to a particular stage of the proceedings.' [Citation.] [¶] In federal practice, a waiver of counsel has been held to remain in effect despite various breaks in the proceedings." (*Ibid*.)

When a defendant has been "clearly and fully admonished of the risks involved in representing himself at both the preliminary hearing and trial stages and who nonetheless elected to represent himself throughout the proceedings," the superior court's "failure to *readvise* defendant of such risks prior to the commencement of trial" is not an error of federal constitutional magnitude, and "the prejudicial error standard applicable to federal constitutional error does not apply." (*Crayton*, *supra*, 28 Cal.4th at p. 363, italics in original.)

Under California statutory law, however, the defendant "in felony proceedings shall be advised of the right to counsel on at least two distinct occasions prior to trial:

first, when the defendant is brought before a magistrate and advised of the filing of the complaint (§ 859), and second, after the preliminary examination, when the defendant is arraigned in superior court on the information (§ 987)." (*Crayton*, *supra*, 28 Cal.4th at p. 360.)

## F. Analysis

The court advised defendant of his right to counsel and, in fact appointed counsel when the complaint was filed at his first appearance, thus complying with both the Sixth Amendment and section 859. When defendant made his *Faretta* motion, the court again advised defendant of his right to counsel. Defendant acknowledged that he understood that right, both verbally and in the written waiver form, he gave a knowing and intelligent waiver, and the court properly granted his *Faretta* motion.

After he was held to answer and the information was filed, however, the court failed to comply with the statutory requirement for advisement, pursuant to section 987, subdivision (a), which states:

> "In a noncapital case, if the defendant appears for arraignment without counsel, he or she shall be informed by the court that it is his or her right to have counsel before being arraigned, and shall be asked if he or she desires the assistance of counsel. If he or she desires and is unable to employ counsel the court shall assign counsel to defend him or her."

As explained in *Crayton*, the superior court's failure to readvise defendant of his right to appointed counsel at the felony arraignment is not federal constitutional error, and the court's violation of section 987, subdivision (a) is reviewed under the harmless error analysis.

> "When a defendant has been fully informed of his or her right to counsel at all stages of the proceedings (including trial), and voluntarily and knowingly has invoked the right to represent himself or herself throughout all the proceedings, the trial court's failure to provide a new advisement and obtain a renewed waiver at the arraignment (as required by § 987) does not operate to terminate or revoke the defendant's validly invoked

24.

constitutional right to represent himself or herself at trial." (*Crayton*, *supra*, 28 Cal.4th at p. 365.)

"[N]othing in the language of the statute provides that when a defendant previously has been informed of his or her right to counsel at trial and has been adequately warned of the pitfalls of representing oneself at trial, the defendant's prior waiver of counsel and exercise of the constitutional right to represent himself or herself shall not 'carry over' or be legally 'effective' in the absence of a renewed warning and waiver." (*Crayton*, *supra*, 28 Cal.4th at p. 364.)

"Although a reversible per se rule may apply under California Constitution, article VI, section 13, when a defendant erroneously is denied the right to counsel or never has knowingly or voluntarily waived that right [citation],… the [*People v.*] *Watson* [(1955) 46 Cal.2d 818] standard applies to the superior court's error in failing to follow the *statutory* command that the court, at the arraignment in superior court, *readvise* a defendant of his or her right to counsel and obtain a renewed waiver of that right." (*Crayton*, *supra*, 28 Cal.4th at p. 364, italics in original.)

"[W]e believe that a trial court's error in failing to comply with section 987 clearly is susceptible to harmless error analysis. The complete record of the trial court proceedings often will shed light upon whether a defendant, despite the absence of an explicit readvisement by the superior court at arraignment, nonetheless was aware that he or she had the right to appointed counsel at the subsequent proceedings and whether an explicit advisement at the arraignment would have been likely to lead the defendant to reconsider the decision to represent himself or herself and request that counsel be appointed." (*Crayton*, *supra*, 28 Cal.4th at p. 365.)

Defendant argues the court's failure to readvise pursuant to section 987, subdivision (a) is prejudicial because the court should have realized he was overwhelmed by the complexity of the case. To the contrary, as the court noted at the sentencing hearing, defendant was a vigorous advocate and he was prepared at all stages of the

proceedings. While his pretrial suppression motions were not successful, his presentation of the evidence was not the reason for the court's denials of those motions, and he made the appropriate objections to preserve appellate review (issue II). His investigator had interviewed many of the robbery witnesses. Defendant used the investigator's reports and extensively cross-examined the witnesses, particularly about the failure of some of the witnesses to identify him in photographic lineups. At trial, he obtained Detective Munoz's concession that he asked for his cell phone number before advising him of the *Miranda* warnings, which led to his motion to exclude all the cell phone evidence (issue V). He never displayed frustration or any indication that he needed the assistance of counsel.

More importantly, there is no reasonable probability in this case that defendant was unaware of his right to be represented by appointed counsel at trial, or that he would have accepted appointment of counsel after he was held to answer, if the court complied with section 987, subdivision (a)'s requirement for the advisement. As we have recounted above, the court engaged in an exchange with defendant toward the end of trial, as the parties discussed the admissibility of the exhibits. The court noted that defendant was representing himself, and asked him: "[Y]ou're aware that you can ask for an attorney at any time. You have not requested an attorney to assist you; correct?" Defendant said that was correct and confirmed he did not want the court to appoint an attorney. After receiving this advisement, defendant filed posttrial motions and never asserted that he wanted an attorney to represent him or he did not know he could have asked for reappointment of counsel.

We thus conclude the court's failure to give the section 987, subdivision (a) advisement was not prejudicial.

## II. **Appellate Review of the *Miranda* Issue**

As recounted above, defendant was interviewed by Modesto officers on February 25, 2012, after he was arrested. He was advised of the *Miranda* warnings twice that day,

agreed to answer questions, and denied any involvement in the Stanislaus County robberies. On February 27, 2012, defendant was interviewed by a Bakersfield officer about the Kern County robberies. He was advised of the *Miranda* warnings twice during that interview, agreed to answer questions, and confessed to the Kern County offenses. He has not challenged the admissibility of this evidence.

On February 28, 2012, defendant was interviewed by Detective Hickman about the Stanislaus robberies. As we will explain in issues III and IV, *post*, Hickman reminded defendant of the *Miranda* warnings but did not give a full advisement, there was an exchange in which defendant mentioned that he did not have an attorney, and defendant ultimately confessed to the Stanislaus County robberies. Defendant filed a motion to "suppress" this confession, and argued he invoked his right to counsel and his confession should be excluded. Defendant's motion was heard and denied at the preliminary hearing.

On appeal, defendant contends the court should have granted his motion to suppress the confession he gave to Detective Hickman on February 28, 2012, about the Stanislaus County robberies, because Hickman should have fully readvised him of the *Miranda* warnings, he invoked the right to counsel, Hickman ignored his request for an attorney and kept questioning him, and his statements were involuntary.

As a preliminary matter, defendant asserts he preserved appellate review of the court's denial of motion to suppress his confession even though he did not file another motion during trial. He points to a lengthy exchange with the court on the first day of trial about motions in limine, when he repeatedly stated that he was trying to preserve appellate review of the denial of his *Miranda* issue, and the court never disagreed with him.

The People disagree and argue defendant has forfeited review of his *Miranda* claims because he failed to renew his suppression motion at trial. In the alternative, the People assert defendant only argued that he invoked his right to counsel, and he never

27.

claimed he should have been readvised of the *Miranda* warnings or that his statements were involuntary, and he cannot raise these issues on appeal for the first time.

We thus turn to the procedural history of defendant's motion to determine if he preserved appellate review of his *Miranda* contentions.

## A. Defendant's Motion to "Suppress"

As explained in issue I, *ante*, defendant moved to represent himself shortly after the complaint was filed, and the court granted his motion.

Prior to the preliminary hearing, defendant filed two motions to "suppress" his February 28, 2012, confession and apology letter, pursuant to section 1538.5. His first motion argued that he was unlawfully detained because he was not timely arraigned, and his subsequent confession should be suppressed as a result of that unlawful detention. His second motion asserted that he tried to invoke his right to counsel at the beginning of the February 28, 2012, interview with Detective Hickman, Hickman illegally kept questioning him, and his subsequent confession was obtained in violation of *Miranda*.

## B. The Preliminary Hearing

At the preliminary hearing, the court considered defendant's two motions to suppress. The prosecutor stated defendant's second issue was based on an alleged *Miranda* violation but inappropriately raised through a section 1538.5 motion to suppress:

> "[A]s I noted in my papers, the defendant filed that [*Miranda* claim] under [section] 1538.5. I believe the case law supports that [section] 1538.5 would be an improper vehicle for the defendant to suppress a confession based on *Miranda* violation. However, it's something he can bring as a[n] [Evidence Code section] 402 hearing, and in light of the fact we have all of our witnesses here today, and we would be seeking to introduce those statements at preliminary hearing, we would ask the Court to treat the defendant's second motion as [an Evidence Code section] 402, and we could proceed today."

28.

The court advised defendant that an Evidence Code section 402 hearing would be a "motion before trial," and asked if he had any objections. Defendant replied: "As long as it accomplishes the same thing." The court explained: "It would. It would be at a later stage of the proceedings but before trial if it goes to trial." Defendant asked if the court would hold the hearing that day. The court noted defendant's first motion was about the delayed arraignment, and the second motion was the *Miranda* issue. The prosecutor suggested that defendant's *Miranda* motion "be treated as [an Evidence Code section] 402, and we can handle it as a [section] 402 today."

The court stated: "So we will deal with that today as well in terms of whether they were, the right to counsel, and *Miranda* issues."

Thereafter, the prosecution called numerous witnesses on the question of whether defendant should be held to answer, and about the admissibility of his February 28, 2012, confession.

The court denied both of defendant's suppression motions, found that he did not invoke his right to counsel and his confession was admissible, and held him to answer.[10]

## C. **Trial**

On the first day of trial, the People filed the following motion in limine:

> "The People request that the Court exclude any evidence and argument which would attempt *to question the admissibility of the Defendant's confession before the jury*. [At the preliminary hearing], this Court ruled that the Defendant's statements to Detective Hickman on February 28, 2012 were admissible and that there was no Miranda violation which would warrant exclusion of the confession. The Court has ruled on this issue and *it is not one for jury consideration*. The People request that the Court admonish the Defendant and disallow any questioning designed to elicit responses that attempt to relitigate this issue in front of a jury." (Italics added.)

---

[10] In issues III and IV, *post*, we will address the court's denial of the suppression motions.

29.

The prosecutor explained that the arraignment and *Miranda* issues had been litigated at the preliminary hearing, and those issues should not be "relitigated in front of the jury, and that he be barred from bringing that up." Defendant said that the only reason he would "elicit that type of information would be for credibility purposes, not for the purpose of arguing – rearguing the motion. It would just be to argue inconsistent testimony and things like that for impeachment purposes." The court initially reserved ruling on that issue until it reviewed the preliminary hearing transcript.

After jury selection, the court returned to the People's motion in limine to exclude "relitigation of defendant's motion to exclude his confession in front of the jury," and asked defendant about his position. Defendant said he just wanted to ask the officers if he was given the *Miranda* warnings, and "what was my response to *Miranda*." The prosecutor replied:

> "If [defendant] is intending to challenge the witness saying that [he] agreed to speak with me and [he] waived his rights, you know, *that issue's already been litigated, and I don't want [defendant], then, to feel like the door is now opened to challenge it anew*." (Italics added.)

Defendant said:

> "That's not my intention. What I'm getting at is I just want it preserved on the record what my response was to *Miranda*, whether or not—you know, what actions proved that I waived my rights not to argue it, not to question the validity, *just to have it on the record in case of appeal*." (Italics added.)

Defendant said he wanted to introduce his statements to Detective Hickman at the beginning of the February 28, 2012, interview, when he said that he did not have a lawyer yet. The prosecutor said she would introduce the entire recording and transcript for that interview to the jury, "so that will be readily available for any sort of appeal." Defendant said he was "just trying to clarify," and he was not going to ask Hickman "did you feel that I invoked my right and you didn't allow me to. I'm not asking something like that." The following exchange occurred:

"THE COURT: Whether the transcript or whether your remarks are coming in or not and *whether you waived, I believe, has already been litigated.*

"[DEFENDANT]: Right.

"THE COURT: And I read that somewhere you folks agreed to do that early on rather than at the beginning of trial. You folks did that back in what was the preliminary or May or something.

"[DEFENDANT]: Started February and ended in March.

"THE COURT: Yeah. It was somewhere towards the beginning of 2013 you folks decided to litigate that issue prior to the beginning [of] trial.

"[DEFENDANT]: Correct.

"THE COURT: And I think there was an agreement on the record to do that. So Judge Cordova made the decision, and *I don't think you're wishing to relitigate that; correct?*

"[DEFENDANT]: No. I just didn't understand. I guess what I'm getting at is I thought the response would have to come from the witness' mouth. I didn't realize that – I guess I didn't even consider the fact that the transcript, transcript and video or audio would be preserved.

"THE COURT: It's coming in. It will be preserved as evidence." (Italics added.)

The court confirmed that defendant had seen the transcript prepared by the prosecutor. The exchange continued.

"[DEFENDANT]: I guess maybe I should explain what I'm trying to get across. *I don't necessarily agree with the decision that Judge Cordova made* [at the preliminary hearing]. *In any event that I appeal, I would like for the appeal courts to be able to review the entire statement.*

"[THE PROSECUTOR]: And it will be part of the record.

"[DEFENDANT]: Right.

"THE COURT: Will be part of the record.

"[DEFENDANT]: I'm not – that's all I wanted." (Italics added.)

31.

Defendant did not further challenge the admissibility of his confession to Hickman at trial.

## D. **Further Trial Discussion About** *Miranda* **Issue**

During trial, a prosecution witness was about to testify regarding the search of the contents of defendant's cell phone. The officer had obtained a search warrant for the cell phone and the forensic contents were extracted. Defendant objected and argued that his cell phone number was illegally obtained when Detective Munoz asked him several "background" questions prior to giving him the *Miranda* warnings during his first interview on February 25, 2012, and that information was used to obtain the search warrant.[11]

The court initially refused to hear any argument on the issue:

> "We already dealt with the *Miranda* issue. *I believe you dealt with the issue with Judge Cordova. You both stipulated to having that issue decided earlier.* Also, I didn't hear that issue brought up beginning of this trial." (Italics added.)

The prosecutor clarified that she previously advised defendant that she would not rely on his pre-*Miranda* statements to Detective Munoz, and the court never ruled on the admissibility of his statements to Munoz. "The *Miranda* ruling that we previously made … was based solely on … the second interview that the defendant did with Detective Hickman."

The court advised defendant that his objections to Detective Munoz's pre-*Miranda* question about his cell phone number should have been raised in a motion in limine at the beginning of trial, and "I think I asked a few times. I wanted to make sure. *I knew that this Miranda issue had been determined at the preliminary hearing*." (Italics added.) The prosecutor said she was being "sandbag[ged]" by defendant raising this issue in the

---

**11** In issue V, *post*, we will address defendant's contentions about the admissibility of his cell phone.

midst of trial. Defendant said he was not aware of the basis for a motion to exclude his cell phone number until Munoz testified at trial. The court denied defendant's motion to exclude his cell phone number.

Later in trial, defendant again challenged the admissibility of the information obtained from his cell phone. After a lengthy discussion, the prosecutor conceded that she intended to ask Detective Munoz about defendant's pre-*Miranda* statements in his first interview, when he asked for defendant's cell phone number. The court again asked whether that issue had been resolved at the preliminary hearing. The prosecutor said it was not addressed, and defendant should have the opportunity to challenge it. As we will discuss in issue V, *post*, the court conducted a hearing as to the admissibility of the cell phone, and denied defendant's objections.

### E. Motions Based on Fourth and Fifth Amendment Violations

The question is whether defendant's *Miranda* issues as to the admissibility of his confession on February 28, 2012, raised in his "suppression" motion at the preliminary hearing, and which were denied in the course of the evidentiary hearing held in the midst of preliminary hearing, were preserved for appellate review, even though he did not renew the motion at the time of trial. A secondary consideration if whether the trial court prevented him from renewing the motion.

"A motion under section 1538.5 may be used to suppress evidence which is claimed to be the fruit of Fourth Amendment violations, such as an illegal arrest, but it may not be used to suppress statements on the ground they were involuntarily induced contrary to Fifth Amendment protections." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1005, disapproved on other grounds in *People v. Loyd* (2002) 27 Cal.4th 997, 1008, fn. 12.) "[W]here the defendant moves to suppress evidence at the preliminary hearing, he or she must again raise the issue of the validity of a search in superior court in order to preserve the issue for appeal." (*People v. Garrido* (2005) 127 Cal.App.4th 359, 364.) "The unification of the municipal and superior courts has not abrogated the need for

renewal of a motion to suppress evidence following certification of a case to the superior court.  [Citations.]"  (*Ibid.*)

As explained above, defendant filed two motions to "suppress" his February 28, 2012, confession, pursuant to section 1538.5.  Defendant's first motion appropriately relied on section 1538.5 to claim he was not timely arraigned, since he argued that his subsequent statements were the result of an illegal detention.  (See, e.g., *People v. Boyer* (1989) 48 Cal.3d 247, 267, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)  The court rejected defendant's argument and found he was timely arraigned.  Defendant never renewed this issue in the trial court, and he has not challenged the court's arraignment finding on appeal.

Defendant's second motion to "suppress" was also filed pursuant to section 1538.5.  This motion asserted he invoked his right to counsel at the beginning of the February 28, 2012, interview, Detective Hickman ignored his invocation and kept questioning him, and his subsequent confession was illegally obtained.  This motion was not based on an illegal detention or search, but on an alleged *Miranda* violation.  As part of the preliminary hearing, the court addressed the matter as an evidentiary hearing pursuant to Evidence Code section 402, and held defendant's alleged invocation was vague and ambiguous.  The question is whether the court's denial of this issue has been preserved for appellate review.

"A pretrial ruling on a claimed Fifth Amendment violation is subject to reconsideration by the trial court, and objection on Fifth Amendment grounds to the admissibility of evidence is waived *if not made at trial when the evidence is offered*." (*People v. Edelbacher*, *supra*, 47 Cal.3d at p. 1005, italics added; *People v. Crittenden* (1994) 9 Cal.4th 83, 126 (*Crittenden*), reversed on other grounds in *Crittenden v. Chappell* (2015) 804 F.3d 998.)

*Crittenden* addressed the circumstances where a pretrial *Miranda* ruling is preserved for appellate review.

"[I]n *People v. Morris* [1991] 53 Cal.3d 152, 189-190 …, we concluded that if a motion to exclude evidence is made raising a specific objection, directed to a particular, identifiable body of evidence, *at the beginning of or during trial* at a time when the trial judge can determine the evidentiary question in its appropriate context, the issue is preserved for appeal without the need for a further objection *at the time the evidence is sought to be introduced*….

"In addition, in *People v. Wharton* (1991) 53 Cal.3d 522, 549–550…, we relied upon *Morris* to conclude that, because the three criteria outlined in *Morris* were met, the defendant had not waived the issue in question for purposes of appeal where, in a *pretrial* motion, the defendant had moved to exclude evidence based upon the psychotherapist-patient privilege and did not object at trial to admission of the evidence on that ground. Further, in *People v. Clark* (1992) 3 Cal.4th 41…, we considered whether the defendant, *having made a motion and having obtained a hearing pretrial on the issue whether to exclude his statements pursuant to Miranda, was entitled to another hearing on the Miranda issue during the trial*. We concluded the defendant was not entitled to a second hearing, based in part upon the reasoning of *Morris* that such *in limine* hearings concerning the admissibility of evidence should be conducted separately, prior to the introduction of evidence at trial. (*Id.* at p. 119.)" (*Crittenden*, *supra*, 9 Cal.4th at p. 127, italics added.)

*Crittenden* concluded that "it would appear inconsistent to require that defendant renew his objection to such evidence at trial or lose his right to raise the issue on appeal, *while concluding, nevertheless, that he is not entitled to any further hearing on the objection*. [Citation.] Because we have held a defendant is not obligated to renew a pretrial motion that is based upon a statutory privilege, *it would be anomalous to subject a defendant raising a claim arising under the Constitution to a different rule*." (*Crittenden*, *supra*, 9 Cal.4th at p. 127, italics added.)

## F.  Analysis

*Crittenden's* analysis supports defendant's argument that his appellate contentions about the alleged *Miranda* violation have been preserved. He made a pretrial motion to "suppress" his confession based on the alleged *Miranda* violation. The prosecutor pointed out that the motion was improperly made under section 1538.5, and it should be

heard at a hearing pursuant to Evidence Code section 402. The court explained the matter to defendant, and defendant agreed to treat the preliminary hearing as an evidentiary hearing on the issue. Defendant's motion was heard and denied.

We further reject any claim that defendant failed to preserve review of his *Miranda* issue given the extensive discussion between the court, the prosecutor, and defendant on the first day of trial. The prosecutor's motion in limine sought to prevent defendant from arguing that his *Miranda* rights were violated *in the jury's presence*, and defendant agreed that he would not do so.

However, the court also told defendant the *Miranda* issue had already been decided at the preliminary hearing, and "I don't think you're wishing to relitigate that." Defendant again agreed but repeatedly stated that he wanted to preserve appellate review of his *Miranda* claim because he disagreed with the ruling by the preliminary hearing judge. The trial court never responded or disagreed.

"[W]hen a trial judge gives misleading advice to a defendant not represented by counsel, we must determine whether such advice may have caused a miscarriage of justice." (*People v. Redmond* (1969) 71 Cal.2d 745, 759.) For example, in *People v. Pugh* (2002) 104 Cal.App.4th 66, the court held that a defendant, who represented himself, had waived any appellate claims of prosecutorial misconduct by failing to object. On appeal, the defendant argued the trial court discouraged him from objecting and led him to believe an objection would be futile. *Pugh* disagreed and held the trial court simply advised the defendant that he could not call the prosecutor a liar in front of the jury. (*Id*. at p. 75.)

> "The court made clear that the argument of facts outside the record or misstatement of the evidence were objectionable and that when meritorious, such objections would be sustained. The court did not suggest in any way that [the defendant] was foreclosed in any manner from addressing either in argument or by objection any improper argument. The court merely told appellant he could not in argument call the prosecutor a liar. [¶] Self-

36.

representation has many pitfalls.  [The defendant] has stumbled into one of them."  (*Ibid.*)

A different conclusion was reached in *People v. Goodwillie* (2007) 147 Cal.App.4th 695, the trial court and the prosecutor wrongly advised the defendant about the terms of a plea agreement.  The court held the error was reversible:

> "Although a pro. per. defendant is responsible for informing himself regarding the substantive and procedural law at issue in his case, the court and the prosecutor, as officers of the court, have a duty not to misstate the law, whether intentionally or not.  By misinforming [defendant] as to the consequences of the proffered plea bargain, the court and the prosecutor caused him to reject an offer that was more favorable to him than the result after trial, and one that he had indicated a willingness to accept.  [¶] … [¶] The trial court and prosecutor's misunderstanding brought the plea bargaining process to a halt, and thus prevented [defendant] from obtaining a plea offer more favorable to him than the sentence he received after trial.  This violates notions of fundamental fairness assured by the due process clause of the Fourteenth Amendment.  [Citation.]"  (*Id.* at pp. 734–735.)

In this case, defendant repeatedly told the trial court on the first day of trial that he disagreed with the decision at the preliminary hearing about his *Miranda* claims, and that he wanted to preserve appellate review.  Defendant repeated this position when the court addressed his subsequent objection to the cell phone evidence.  Given the context of the court's statements, defendant was led to believe that he had preserved review of his *Miranda* claim and did not need to raise the issue again.

We thus conclude that, given the circumstances and the statements by the court and the parties at the beginning of trial, defendant's *Miranda* contentions have been preserved for appellate review.

### *Preservation of particular issues*

As a separate matter, the People assert that defendant's motion to "suppress" his confession was only based in his alleged invocation of his right to counsel.  The People argue defendant cannot raise additional issues on appeal about whether Detective

Hickman should have fully advised him of the *Miranda* warnings, or if Hickman engaged in coercive interrogation techniques to obtain his confession.

The People are partially correct. "An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later in a motion to strike stating specific or different grounds." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22.) " '*Miranda*-based claims are governed by this rule.' " (*Crittenden*, *supra*, 9 Cal.4th at p. 126.)

At the preliminary hearing, defendant argued his confession to Detective Hickman should be "suppressed" because he invoked his right to counsel. He also argued that Hickman made implied promises of leniency when they discussed whether he could "lump" his cases together. Defendant never argued that Hickman should have fully readvised him of the *Miranda* warnings. We will briefly review the advisement issue.

### III.   *Miranda* **Advisements**

Defendant asserts his confession on February 28, 2012, should have been excluded because Detective Hickman did not fully advise him of the *Miranda* warnings at the beginning of the interview. While defendant did not raise the issue below, we will address the sufficiency of the *Miranda* to put his subsequent confession in context.

#### A. **Background**

Defendant was arrested on February 25, 2012, and remained in custody for the duration of the proceedings. At 10:00 a.m., Detective Munoz met defendant in an interview room at the police department, and fully advised him of the *Miranda* warnings. Defendant said he understood his rights and was willing to answer questions. During this interview, defendant denied any involvement in the robberies and offered alibis.

At 12:50 p.m. on February 25, 2012, Detective Munoz left and Detective Hickman entered the same interview room. Hickman again fully advised defendant of the *Miranda*

warnings.  Defendant said he understood his rights.  Hickman asked defendant if he would answer questions, defendant agreed, and he again denied committing the robberies.

At the preliminary hearing, when the court considered defendant's *Miranda* arguments, Detective Hickman testified that Sergeant Saso interviewed defendant on February 27, 2012, about the Kern County robberies.  Hickman testified that in preparation for the preliminary hearing, he contacted Saso and learned that Saso advised defendant of the *Miranda* warnings prior to that interview.  Hickman testified he did not know until that time that Saso had given the *Miranda* warnings to defendant.[12]

At 10:30 a.m. on February 28, 2013, Detectives Hickman and Fisher interviewed defendant at the nurse's station at the jail.  Based on the transcript of the interview, Hickman introduced himself and Fisher, and asked defendant if he got some rest.

> "Hickman:        … *Just want to remind you you're still under Miranda…*
>
> "[Defendant]:     Right.
>
> "Hickman:        *As far as me reading your Miranda rights and stuff. So anything you tell me can be used against you*.  [¶]  Okay?
>
> "[Defendant]:     Okay."  (Italics added.)

At the preliminary hearing, Detective Hickman testified he did not fully advise defendant of the *Miranda* warnings because "you seemed like a smart man when I told

---

[12] At the preliminary hearing, Detective Hickman offered the only evidence about Sergeant Saso's interview with defendant; Saso did not testify.  Defendant has never challenged the validity of Saso's *Miranda* advisement or the admission of his confession to Saso.  The recording and transcript of Saso's interview were introduced at trial, which revealed that the interview began at 1:00 p.m., and Saso fully advised defendant of the *Miranda* warnings.  Saso asked defendant if he understood his rights and wanted to talk with him.  Defendant said sure.  At 1:15 p.m., Saso turned off the tape recorder at defendant's request.  At 2:44 p.m., Saso turned on the tape recorder after asking for and receiving defendant's permission.  Saso again fully advised defendant of the *Miranda* warnings.  Defendant said he understood and confessed to the Kern County robberies.

you, you are still under *Miranda*, and acknowledged that by saying right. I took it as you understood."**13**

### B. Analysis

Even if defendant had preserved the issue for review, we find that Detective Hickman was not required to fully readvise him of the *Miranda* warnings prior to the February 28, 2012, interview.

"[A] *Miranda* readvisement is not necessary before a custodial interrogation is resumed, so long as a proper warning has been given, and 'the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.' " (*People v. Smith* (2007) 40 Cal.4th 483, 504.) "We have established several factors to determine whether readvisement is necessary prior to a subsequent interrogation held after an earlier valid *Miranda* waiver: 1) the amount of time that has passed since the initial waiver; 2) any change in the identity of the interrogator or location of the interrogation; 3) an official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) further indicia that defendant subjectively understands and waives his rights." (*Ibid*.)

"We have permitted as 'reasonably contemporaneous' the resumption of interrogation without a readvisement even a day or two after the initial waiver." (*People v. Duff* (2014) 58 Cal.4th 527, 555; see, e.g., *People v. Mickle* (1991) 54 Cal.3d 140, 171 [interrogation conducted 36 hours after the first interview was reasonably contemporaneous]; *People v. Williams* (2010) 49 Cal.4th 405, 434–435 [interrogation conducted 40 hours after initial advisement and waiver was reasonably contemporaneous]; *People v. Smith, supra,* 40 Cal.4th at pp. 504–505 [less than 12 hours since prior advisement]; *People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1089 [16

---

**13** As explained in issue I, *ante*, defendant represented himself throughout the entirety of the proceedings and cross-examined the witnesses, which is why Detective Hickman refers directly to him as he explains what happened during the interview.

hours]; *Martin v. Wainwright* (11th Cir. 1985) 770 F.2d 918, 930–931, [readvisement not necessary when second interrogation occurred one week after the first interrogation], reversed on other grounds in *Coleman v. Singletary* (1994) 30 F.3d 1420, 1424.)

In this case, defendant was fully advised of the *Miranda* warnings twice on February 25, 2012, and waived his rights. He was fully advised of the *Miranda* warnings twice on February 27, 2012, and again waived his rights. He has not challenged the validity of these advisements or his waivers.

Less than 24 hours later, Detective Hickman reminded defendant that he was "still under *Miranda*" and "anything you tell me can be used against you." Defendant said he understood. Hickman's failure to fully readvise defendant of the *Miranda* warnings did not render his subsequent statements inadmissible.

Defendant asserts that we cannot rely on Sergeant Saso's *Miranda* advisement on February 27, 2012, to measure Detective Hickman's duty to readvise him on February 28, 2012. Defendant points to Hickman's testimony at the preliminary hearing: Hickman did not know that Saso had advised him of the *Miranda* warnings when Hickman conducted the February 28, 2012, interview, and Hickman only learned about Saso's advisements when he spoke to him just before the preliminary hearing. Defendant thus concludes Hickman was required to fully readvise defendant on February 28, 2012, because Hickman believed defendant had last received the *Miranda* warnings on February 25, 2012, approximately 70 hours before his interview with Hickman.

This argument is meritless. Since defendant never raised any issue about Sergeant Saso's advisement at the preliminary hearing, the prosecution was not given the opportunity to fully develop the evidence. Nevertheless, it is undisputed that Saso advised defendant of the *Miranda* warnings twice, less than 24 hours before Detective Hickman interviewed him. Defendant never challenged Hickman's preliminary hearing testimony that Saso advised defendant of the *Miranda* warnings on February 27, 2012. At trial, defendant never challenged the admissibility of his statements to Saso, disputed

41.

that Saso fully advised him of the *Miranda* warnings at that interview, or claimed he did not understand his rights when advised by Saso.

We thus conclude that when Detective Hickman met with defendant on February 28, 2012, defendant had been fully advised of the *Miranda* warnings four times, the last time less than 24 hours earlier. He waived his rights; he did not ask for an attorney; Hickman reminded him that he had been previously advised of his rights; and Hickman was not required to fully readvise him.

## IV. <u>Defendant's Right to Counsel Claims</u>

We have concluded that defendant's *Miranda* contentions have been preserved for appellate review. We have also concluded that defendant had been fully advised of the *Miranda* warnings four times; defendant waived his rights; agreed to answer questions; did not invoke his right to counsel; and Hickman was not required to readvise him of the warnings on February 28, 2012.

We now turn to the merits of defendant's contention that the court should have granted the motion he made at the preliminary hearing to "suppress" the confession he gave to Detective Hickman on February 28, 2012. Defendant contends he invoked his right to counsel at the beginning of the interview, but Hickman ignored his request and improperly continued to question him. Defendant argues his subsequent confession and apology letter should have been excluded as involuntary because his constitutional rights were violated.

"In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)

We now turn to the transcript of Detective Hickman's interview with defendant on February 28, 2012, and Hickman's testimony at the preliminary hearing, to determine if defendant invoked his right to counsel.

## A.  <u>The Transcript of Detective Hickman's Interview</u>[14]

Detectives Hickman and Fisher interviewed defendant at the jail at 10:37 a.m. on February 28, 2012.  As explained in issue IV, *ante*, Hickman reminded defendant that he was "still under *Miranda*" and "anything you tell me can be used against you." Defendant said he understood.  Hickman asked defendant if he had any questions, or anything that he could take to the district attorney.

The following exchange ensued:

---

[14] When the court heard defendant's *Miranda* motion at the preliminary hearing, Detective Hickman testified the February 28, 2012, interview was recorded.  The prosecutor stated he had prepared a partial transcript.  Defendant objected to the prosecutor's transcript, said he had prepared his own transcript of "important" parts, and claimed the two versions did not match.

Thereafter, the court heard testimony from Detective Hickman about the February 28, 2012, interview.  Hickman reviewed the transcript as he testified about the interview. After hearing Hickman's testimony, the court said it wanted to listen to the recording of the interview given the importance of the issues.  The court explained that local rules stated that a recording could not be played without a transcript.  The court asked the parties if they could agree to a transcript, and they said yes.

On the final day of the preliminary hearing, the prosecutor presented the court with the recording and the transcript, and said all disagreements with defendant had been resolved.  The recording and the transcript were introduced into evidence.  The court played the recording in the courtroom and stated it had listened to the portion of the recording corresponding to pages one to eight of the transcript, based on defendant's claims about his alleged invocation of the right to counsel.  The parties made minor corrections to the transcript, and then argued the motion based on the transcript.

This same recording and transcript were subsequently introduced at trial without objection.  We will thus review defendant's contentions about the February 28, 2012, interview based on both Detective Hickman's hearing testimony, and the recording and transcript of the interview.

43.

"[Defendant]:     *Well I'm still sorta in the dark.  Like I don't even have a lawyer.*

"Hickman:     Not yet.

"[Defendant]:     Anything like that.

"Hickman:     Yeah when you go to arraignment…

"[Defendant]:     *I'd like some advice before I…*

"Hickman:     Right, I understand.

"[Defendant]:     *Move forward.*

"Hickman:     Okay, alright.  Well I just, I didn't know, if you know.  I wanted to double check with you.  I think your arraignment is set for this afternoon.

"[Defendant]:     Is it?

"Hickman:     I'm not totally sure.  Um, usually it's within a couple of days, so…

"[Defendant]:     Alright.

"Hickman:     Okay, so, um, I just wanted to check with you just because of what we told you, you know as far as the evidence what Detective, I know, I don't' know if you and Detective Munoz got off on the right foot or not.

"[Defendant]:     Hmmm.

"Hickman:     He kinda, me watching the monitor, watching the interview room, you didn't seem like…it seemed like you were wanting to say something but you were also wanted him to answer some questions.[15]

"[Defendant]:     Hmmm.

"Hickman:     And some of those questions we can't answer right now.

---

[15] Detective Hickman was not present when Detective Munoz interviewed defendant on February 25, 2012, but Hickman apparently monitored the interview in another room.

"[Defendant]:        Right.

"Hickman:        Unfortunately.  Um, except for the fact that you do know you're under arrest for the robberies…

"[Defendant]:        Right.

"Hickman:        In Patterson.

"[Defendant]:        Yeah, I'm aware of that.

"Hickman:        (Unintelligible) Riverbank, Yes.  So (unintelligible) I let you know, I could let you know.  (Unintelligible)  I because I felt, like I told you at the end, I felt that you were wanting to say something and I truly believe, like I told you, all the years that I've been doing this People that tell the truth, this, that shows the true character of the true person.

"[Defendant]:        Sure.

"Hickman:        If they made a mistake.

"[Defendant]:        Right, absolutely.

"Hickman:        Okay.  Um, if at all, any time like I said, if you want to talk to me.  I just thought I'd come down and try and talk to you again before, after you got some rest, since I…

"[Defendant]:        (Unintelligible)

"Hickman:        When I was talking to you, you were kind of on hour 26, I think.

"[Defendant]:        Yeah.  (Laughing)

"Hickman:        It was somewhere around there, so, I know were real tired so…

"[Defendant]:        *Yeah, um.  Well, basically, I, I want to lump everything togethe*r."  (Italics added.)

Defendant said "Bakersfield" had talked to him the previous day, and he did not want to "have a bunch of cases" but wanted "like one, get it done."[16]  Defendant said he

---

**16** Defendant's reference to "Bakersfield" was to his interview with Sergeant Saso about the Kern County robberies.

did not want "to be in trials for the next two years," and he did not want to be taken to Kern and San Luis Obispo after that. "I just want to get it over with."

Detectives Hickman and Fisher reminded defendant that he was previously asked, and denied, that he had been to Patterson, Gilroy and Paso Robles. Defendant told them that he had been to those places.

> "[Defendant]: *I just didn't want to say anything because I wanted advice first, but it seems…*
>
> "Hickman: I understand that.
>
> "[Defendant]: (Unintelligible)
>
> "Hickman: Um, that's the only because we can't give you any advice. I can't give you advice on how to help yourself. Okay, now well, I can and can't. *The only advice that I can give you is to just tell me the truth about what happened.*" (Italics added.)

Defendant said he was sure they could tell that something was weighing on his conscience. Detective Hickman said that the bank tellers were extremely frightened and thought he had a gun, and "that's even something later on if you decide you want to write an apology letter to those folks" for "putting them through that traumatic experience." Defendant asked which one. Hickman said the young lady in the second Patterson robbery was very shaken and frightened. Defendant said the "girl" in Modesto "flipped out" and "lost it" and made him feel "absolutely terrible." Defendant then confessed to the Stanislaus County robberies.

### B. Detective Hickman's Hearing Testimony

At the preliminary hearing, Hickman testified about his response when defendant said he was "still sort of in the dark and I don't have an attorney yet."

> "[Defendant] had mentioned that he was still kind of in the dark, didn't even have a lawyer yet. I advised him that I thought his arraignment was later that afternoon, and that he would be getting a lawyer then, or a Public Defender. He – we just basically talked for probably the first three paragraphs of the interview. We talked back and forth. *I was telling him*

*how I was giving him a chance to come clean, or because of the evidence we had against him. Also, at that point, he – when he mentioned the lawyer part, we started to leave. We just – okay. Well we're done.*" (Italics added.)

Detective Hickman testified the detectives "decided that if he wasn't going to speak, he wasn't going to speak. And, you know, in our minds we decided to leave, walk out of the room. We were getting our stuff together." Hickman testified defendant never said he wanted a lawyer, just that he did not have one.

"I believe I recall Detective Fisher and I were kind of standing…. [¶] We stood up from behind the desk, and started to move – I started to move toward the door."

Detective Hickman testified that defendant never specifically asked for an attorney, and just said that he hadn't talked to a lawyer. It was "kind of vague" and "indecisive." Hickman gave defendant the opportunity "to say I want my lawyer before I talk to you." Hickman testified they stood up to leave "[i]n case you said you wanted your lawyer. I wasn't going to ask you questions. And I didn't ask you questions at that point." Hickman got up to leave because he assumed defendant was about to invoke his right to counsel and ask for a lawyer.

Detective Hickman testified that when defendant said "he just wanted to get some advice," he never said who he wanted advice from. Hickman told defendant that they could not give him any advice except to tell the truth.

Detective Hickman testified he was ready to leave because defendant said he didn't have a lawyer, and "I wasn't going to ask any questions." Hickman testified: "So when I started to leave the room, *is when you said I just want to lump everything together.*" (Italics added.) Defendant "continued talking, so I stayed and continued recording."

Detective Hickman testified defendant kept talking and never asked for an attorney or said he wanted to end the interview. Defendant gave a detailed confession about the Stanislaus County robberies. He did not seem stressed, and he kept talking "to

47.

the point of want[ing] to write his apology letter." Hickman never made any threats. He never promised leniency, that he would lump all the cases together, or offered to make a deal.

### C. The Court's Denial of the Motion

After the court heard Detective Hickman's testimony and the recording of the February 28, 2012, interview, the parties argued the motion. Defendant cited to the transcript and asserted he invoked his right to counsel based on his statements that he was in the dark, he had not talked to a lawyer, and he wanted advice about lumping his cases together. Defendant further argued that Hickman made implied promises of leniency when they discussed whether his cases could be disposed of together.

The prosecutor replied that defendant's statement that he did not have a lawyer yet did not constitute an invocation because he never asked for an attorney. When defendant said he wanted advice before going forward, he never said who he wanted advice from, and continued to talk to the detectives. The prosecutor argued that Detective Hickman did not interrogate defendant, but simply told defendant why he was there, gave details about the upcoming arraignment, and offered to talk to defendant if he wanted to talk. The prosecutor further argued there was a pause and then defendant moved the conversation forward when he asked about lumping the cases together.

The court denied defendant's motion to suppress his February 28, 2012, confession and apology letter. The court rejected his claim that he had invoked his right to counsel. The court found his alleged invocation was "ambiguous or equivocal," and it was "vague in my view whether you were requesting counsel at that point."

### D. *Miranda* and the Right to Counsel

"To protect the Fifth Amendment privilege against self-incrimination, a person undergoing a custodial interrogation must first be advised of his right to remain silent, to the presence of counsel, and to appointed counsel, if indigent. [Citation.] As long as the suspect knowingly and intelligently waives these rights, the police are free to interrogate

48.

him.  [Citation.]  However, if, at any point in the interview, the suspect invokes his rights, questioning must cease.' " (*People v. Stitely* (2005) 35 Cal.4th 514, 535.)  If the suspect requests counsel at any point, the interrogation must cease until an attorney is present. (*Edwards v. Arizona* (1981) 451 U.S. 477, 482 (*Edwards*); *People v. Davis* (2009) 46 Cal.4th 539, 590.)

"A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted.  Although *Edwards* provides an additional protection − if a suspect subsequently requests an attorney, questioning must cease − it is one that must be affirmatively invoked by the suspect." (*Davis v. United States* (1994) 512 U.S. 452, 460−461 (*Davis*).)  "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect *clearly* requests an attorney." (*Id.* at p. 461, italics added.)

> "In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously'* assert his right to silence or counsel.  [Citation.]  It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights.  [Citation.]  Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda* … either to ask clarifying questions or to cease questioning altogether. [Citation.]  Of course, such an approach may disadvantage suspects who, for emotional or intellectual reasons, have difficulty expressing themselves. [Citation.]  However, a rule requiring a clear invocation of rights from someone who has already received and waived them 'avoid[s] difficulties of proof' [citation], and promotes 'effective law enforcement.' [Citation.]" (*People v. Stitely*, *supra*, 35 Cal.4th at p. 535, italics in original, citing *Davis*, *supra*, 512 U.S. at pp. 459−462.)

The defendant "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'  [Citation.]  '[A] reviewing court … must ask whether, in light of the circumstances, a reasonable officer would have understood a

defendant's reference to an attorney to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel, and with no further requirement imposed upon the officers to ask clarifying questions of the defendant.' [Citations.]" (*People v. Cunningham* (2015) 61 Cal.4th 609, 645–646, citing *Davis*, *supra*, 512 U.S. at p. 459.)

"We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue." (*Davis*, *supra*, 512 U.S. at p. 462, italics in original.)

The erroneous admission of statements obtained in violation of *Miranda* is subject to the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Cunningham* (2001) 25 Cal.4th 926, 994.) A continued interrogation after a *Miranda/Edwards* violation does not "inherently constitute coercion" without evidence of actual coercion or other circumstances bearing on the suspect's free will. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1039–1040.) Merely advising a suspect that it would be better to tell the truth, unaccompanied by either a threat or a promise, does not render a confession involuntary. (*People v. Holloway* (2004) 33 Cal.4th 96, 115.)

### E. Unambiguous Invocations

We turn to some examples of when a suspect has unambiguously invoked his right to counsel. In *Alvarez v. Gomez* (9th Cir. 1999) 185 F.3d 995 (*Alvarez*), the suspect began requesting an attorney as soon as he was asked whether he wished to waive his right to remain silent and submit to questioning. He asked: " 'Can I get an attorney right now, man?' " The officer responded: " 'Pardon me?' " The suspect repeated: " 'You can have [an] attorney right now?' " The officer responded that the suspect could have

an attorney appointed, and the suspect repeated: " 'Well, like right now you got one?' " The officer said counsel would not be available until the time of the arraignment. (*Id.* at pp. 996–997, italics omitted.)

*Alvarez* held the defendant's questions, in context, were clear and unequivocal invocations of his right to counsel. *Alvarez* further held that it was evident the police were not merely seeking clarification, but sought to undermine the defendant's intent to assert his rights because of the "around the clock availability of *Miranda* duty lawyers" at the jail. (*Alvarez*, *supra*, 185 F.3d at p. 998 & fn. 3.)

> "… Alvarez's thrice-repeated questions, when considered together, constituted an unequivocal request for an attorney. *See e.g., Smith v. Illinois,* 469 U.S. 91, 97…, 105 S.Ct. 490 (1984) (deeming a suspect's statement, 'Uh, yeah, I'd like to do that,' upon hearing of his right to counsel a clear invocation); [*United States v.*] *de la Jara,* 973 F.2d [9th Cir. 1992 746,] 750 (deeming 'Can I call my attorney?' or 'I should call my lawyer' a clear invocation of the right to counsel); *Robinson v. Borg,* 918 F.2d 1387, 1389 (9th Cir. 1990) (deeming 'I have to get me a good lawyer, man. Can I make a phone call?' a clear invocation of the right to counsel); *Shedelbower v. Estelle,* 885 F.2d 570, 571–73 (9th Cir. 1989) (deeming 'You know, I'm scared now. I think I should call an attorney' a clear invocation of the right to counsel); *Smith* [*v. Endell* (9th Cir. 1988)]*,* 860 F.2d [1529,] 1529-31 (deeming 'Can I talk to a lawyer?' a clear invocation of the right to counsel). Moreover, we disagree with the district court's conclusion that the officers 'clearly believed that Petitioner was merely asking clarifying questions regarding his right to counsel,' and answered those questions in 'good faith.' The correct answer to each of Alvarez's three questions, after all, was a simple unambiguous 'yes.' " (*Id.* at p. 998, fns. omitted.)

In *People v. Neal* (2003) 31 Cal.4th 63, the court held the defendant unequivocally and repeatedly invoked his right to silence and counsel, by saying, " 'I am ready to talk to my lawyer' " and " 'I am not saying nothing now.' " (*Id.* at p. 73.) However, the interrogating officers purposefully ignored the invocations and continued their intensive interrogation concerning the crime. When the defendant resisted incriminating himself, they placed him in a cell overnight without food, drink, or toilet facilities, leading to his

making a statement on the following day.  (*Id*. at pp. 72−80.)  *Neal* held the defendant's statements should have been excluded, and were coerced and involuntary, and continued the substantive interrogation of a youthful, inexperienced defendant pursuant to a departmental policy designed to disregard invocations of *Miranda* rights.  (*Id*. at pp. 68−69.)

In *In re Art T*. (2015) 234 Cal.App.4th 335, a 13-year-old boy was taken into custody as a shooting suspect.  He was shown a videotape of a shooting during a custodial interrogation.  The court held that his statement − " 'Could I have an attorney? Because that's not me' " − was an unequivocal and unambiguous invocation of his right to counsel.  (*Id*. at pp. 338−339.)  The court held a reasonable officer would have known under the circumstances, including the juvenile's age, lack of maturity and sophistication, and repeated requests for his mother, that his statement was a request for an attorney. (*Id*. at pp. 355−356.)

### F.  Ambiguous or Vague Invocations

We now review cases where a defendant's statements during custodial interrogations, after receiving the *Miranda* advisements, were vague or ambiguous as to his invocation of the right to counsel.

In *Davis*, *supra*, 512 U.S. 452, the suspect waived his rights but also said, " '[m]aybe I should talk to a lawyer.' "  *Davis* held the suspect's statement was not an unambiguous request for counsel that required questioning to stop.  (*Id*. at p. 455.)

In *People v. Johnson* (1993) 6 Cal.4th 1 (abrogated on other grounds in *People v. Rogers* (2006) 39 Cal.4th 826), an officer told the defendant that he would be charged with murder.  The defendant replied, " 'My mother will put out money for a high price lawyer out of New York.' "  The officer asked for the attorney's name, but the defendant refused.  The defendant asked about possible penalties for murder, and then said, " 'Maybe I ought to talk to my lawyer, you might be bluffing, you might not have enough to charge murder.' "  The officer asked the defendant if he wanted to talk to a lawyer

before answering more questions, and the defendant simply repeated that he thought the officer was bluffing and the interview continued. (*Johnson*, *supra*, at p. 27.) *Johnson* held the defendant's statements were ambiguous and tentative references to an attorney, and he did not invoke his right to counsel. (*Id*. at p. 30.)

In *Crittenden*, *supra*, 9 Cal.4th 83, the defendant asked the interrogating officer, " 'Did you say I could have a lawyer?' " This question was held to be a clarification of rights rather than an unambiguous invocation. (*Id*. at pp. 124, 128-131.)

In *Paulino v. Castro* (9th Cir. 2004) 371 F.3d 1083, the suspect said, " 'Where's the attorney?' " and " 'You mean it's gonna take him long to come?' " The court held these statements were not unambiguous requests for counsel. (*Id*. at p. 1087; see, e.g., *Clark v. Murphy* (9th Cir. 2003) 331 F.3d 1062, 1070 [" 'I think I would like to talk to a lawyer' " was not an unambiguous request for counsel].)

In *People v. Gonzalez* (2005) 34 Cal.4th 1111 (*Gonzalez*), the defendant waived his rights, made incriminating statements, and then told detectives that if he was going to be charged with anything, he wanted to talk to a public defender. One detective informed the defendant that he would be booked that night, but he would be released if polygraph results indicated he was telling the truth. The defendant asked, " 'Book me on what?' " The detective responded, " 'On murder. That doesn't mean you're going to be filed on.' " (*Id*. at p. 1119.) Another detective added that " '[a]n arrest is not a prosecution ....' " The next day, the defendant again asked about a public defender. (*Id*. at p. 1120.)

*Gonzalez* held that, "[o]n its face, defendant's statement was conditional; he wanted a lawyer *if* he was going to be *charged*. The conditional nature of the statement rendered it, at best, ambiguous and equivocal because a reasonable police officer in these circumstances would not necessarily have known whether the condition would be fulfilled since, as these officers explained, the decision to charge is not made by police. Confronted with this statement, a reasonable officer would have understood only that 'the

suspect *might* be invoking the right to counsel,' which is insufficient under *Davis* to require cessation of questioning. [Citation.] Here, moreover, the detectives responded to defendant's statement by explaining to him the difference between being arrested and booked and being charged, thus providing him with an opportunity to clarify his meaning, but at no point in this initial exchange did defendant *unequivocally* request the *immediate* presence of an attorney before he would answer any more questions. It is this type of statement *Davis* requires before the police must terminate the interrogation." (*Gonzalez*, *supra*, 34 Cal.4th at p. 1126, italics in original.)

In *People v. Simons* (2007) 155 Cal.App.4th 948, the defendant agreed to answer questions. The officer explained that she knew about evidence which implicated him in a murder, and she wanted to get his side of the story. As the interview continued, the defendant made incriminating statements about being with the victim but denied committing the crime. The officer said they did not believe him, and the defendant insisted he was telling the truth. The defendant asked, " 'How long would it take for a lawyer to get here for me?' " The officer replied, " 'That's up to you. Do you want an attorney right now?' " The defendant said, " 'How long would it take if I said yeah?' " The officer again said it was the defendant's choice and she would stop the questions if he wanted an attorney. The defendant again asked how long would it take. The second officer said he had no idea, " '… you would be the one to know if … you would have to call someone and … have somebody show up.' " The defendant said he couldn't afford one, and the officers reminded the defendant that the court would appoint one. The defendant asked how long that would take. The officer said: " 'When you go to court.' " The second officer said they wanted to make sure the defendant wanted to talk to them, that other witnesses had talked to them. They would stop if the defendant did not want to talk to them; but the defendant had to be honest with them because they had facts which contradicted his story. The defendant said he was being honest, he would keep talking to the officers, and the interview continued. (*Id*. at pp. 956–957.)

*Simons* relied on *Crittenden* and *Johnson*, held the defendant "did not clearly and unequivocally request an attorney so as to require the detectives to stop their questioning." (*Simons*, *supra*, 155 Cal.App.4th at p. 958.) The defendant's questions "regarding how long it would take for an attorney to get there if he asked for one would lead a reasonable officer to understand only that defendant *might* want an attorney if it would not take too long, which is not enough to require cessation of the interrogation." (*Ibid.*, italics in original.) *Simons* further held "there was nothing inappropriate about the colloquy following defendant's inquiry, which was not misleading and which verified that defendant wished to continue the interview without an attorney present." (*Ibid.*)

In *People v. Smith*, *supra*, 40 Cal.4th 483, the defendant asked how long it would take to get an attorney appointed. Before the detective could respond, the defendant added that he could wait until " 'next week sometime.' " The detective replied, " 'maybe, yeah.' " (*Id*. at p. 503.) *Smith* held the defendant was told he had the right to counsel, and he "never requested an attorney or indicated that he wished to end the interview." (*Ibid.*) The detective did not actively mislead defendant about the availability of counsel or say that it would take a week for an attorney to be appointed, but he "merely responded equivocally to defendant's statement that he could wait up to a week for counsel to be appointed. The detective never represented to defendant that it actually would take up to a week for counsel to be appointed." (*Ibid.*)

In reaching this conclusion, *Smith* noted that "several federal circuit courts have held that a suspect's *Miranda* waiver remains valid even if interrogating officers mislead the suspect about how long it will take to appoint counsel. (See *Soffar v. Cockrell* (5th Cir. 2002) 300 F.3d 588, 591, 596 [holding that a detective's speculation that 'it could take as little as one day or as long as a month' for a suspect to obtain counsel did not invalidate the suspect's *Miranda* waiver]; *Richardson v. Duckworth* (7th Cir. 1987) 834 F.2d 1366, 1367, 1371 [holding that defendant had been fully apprised of his constitutional rights where he was given a *Miranda* advisement and told upon two

occasions that he had the right to speak to a lawyer before being questioned, made an incriminating statement, and then, upon inquiry, was told by the detective that a lawyer would be appointed in court].)" (*People v. Smith*, *supra*, 40 Cal.4th at pp. 503–504.)

In *People v. Bacon*, *supra*, 50 Cal.4th 1082, the defendant initially denied meeting the murder victim; the officers told him that DNA tests were going to be conducted. The defendant then said they would find his DNA because he had consensual sex with the victim. The detective asked for more details about what happened. The defendant said, " 'Yeah, I think it'd probably be a good idea … for me to get an attorney.' " The detective said he was giving the defendant an opportunity to talk. The defendant repeatedly said, " 'Talk to me,' " and continued to answer questions. (*Id*. at p. 1106.) *Bacon* held the defendant's reference to an attorney was equivocal or ambiguous, and his repeated phrase to " 'talk to me' " indicated he wanted the detective to talk to him. *Bacon* also held the detective did not dissuade the defendant from consulting with an attorney when he said he was giving the defendant an opportunity to talk. (*Id*. at pp. 1107–1108.)

In *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203 (*Sauceda-Contreras*), the defendant was advised of the *Miranda* warnings and asked, " 'If you can bring me a lawyer, that way I[,] I with who … that way I can tell you everything that I know and everything that I need to tell you and someone to represent me.' " The officer again asked if he was willing to talk without an attorney present, and the defendant said yes. (*Id*. at pp. 215–216.) The Fourth District reversed the defendant's murder conviction and held that the defendant " 'essentially responded – bring me a lawyer and I will talk,' " and the officer confused the defendant by continuing to talk to him; a dissent argued the defendant's statement was conditional, and the officer properly asked a clarifying question. (*Id*. at pp. 214–215.)

The California Supreme Court granted review in *Sauceda-Contreras*, affirmed the defendant's conviction, and held his alleged invocation was conditional, ambiguous, and

equivocal.  "It was conditional in that it began with an inquiry as to whether a lawyer *could* be brought to defendant.  By responding '[*i*]*f you can* bring me a lawyer ...' (italics added), defendant was expressly asking the officer whether a lawyer could be brought to him, and impliedly asking whether one could be provided *right now,* given that the officer had asked him if he would speak with Detective Blazek 'right now.'  It was equivocal in that defendant went on to plainly state his intent and desire to waive his right to remain silent and 'tell you everything that I know and everything that I need to tell you,' but then ended his response ambiguously with the words 'and someone to represent me.'  From an objective standpoint, a reasonable officer under the circumstances would not have understood defendant's response to be a clear and unequivocal request for counsel.  For that reason, the officers were justified in seeking to clarify defendant's intent."  (*Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 219, italics in original.)

> "It is true that Officer Trapp's suggestion to defendant, 'Okay, perhaps you didn't understand your rights,' failed to address any uncertainty or confusion he may have been harboring about whether counsel could be provided at that time.  Nor did the officer restate the right to counsel or confirm defendant's understanding of that right [citation], or provide him with any relevant information that might have helped him decide whether he might prefer to wait until an attorney could be provided [citation], as would have been the better practice.  [¶]  On the other hand, Officer Trapp immediately followed her less than artful statement, 'Okay, perhaps you didn't understand your rights,' with the pointed question, '[W]hat the detective wants to know right now is *if you're willing to speak to him right now without a lawyer present?*'  (Italics added.)  That inquiry cut right to the core of the matter, making unmistakably clear to defendant that what he was being asked was if he was willing to proceed with the interview 'right now without a lawyer present.'  Officer Trapp had admonished defendant moments earlier of each of his *Miranda* rights, and he had clearly responded that he understood each of them.  Once that question was put to defendant, he quickly and decisively expressed his willingness to proceed with the interview without a lawyer present, confirming for the officer several times that he wished to proceed in that fashion and understood the choice was his."  (*Id.* at pp. 220–221, italics in original, fn. omitted.)

57.

In *People v. Suff* (2014) 58 Cal.4th 1013 (*Suff*), the defendant was arrested on a parole violation and advised of the *Miranda* warnings. The defendant asked the officer, " 'Do I need a lawyer?' " The officer responded, " 'Well, I don't know. Do you need a lawyer?' " The defendant said he didn't know and " '[f]or what I've done, I don't see why I need a lawyer.' " The officer asked the defendant to just talk to her, and the defendant agreed. The interview continued for several hours and included a discussion about the killing of prostitutes. The officer asked for consent to search his house. The defendant replied, " 'I need to know, am I being charged with this, because if I'm being charged with this I think I need a lawyer.' " The officer replied, " 'Well, at this point, no you're not being charged with this,' " and the defendant consented to the search. The interrogation continued for several more hours, and the defendant made additional incriminating statements about being in an orange grove where a body was found. The officer asked for more information " 'about the body you left there.' " The defendant said: " 'I better get a lawyer now. I better get a lawyer, because you think I did it and I didn't.' " The interview continued and defendant made more incriminating statements. (*Id.* at p. 1067.)

*Suff* relied on *Gonzalez* and rejected the defendant's claim that his statement – " 'I need to know, am I being charged with this, because if I'm being charged with this I think I need a lawyer' " – was an unambiguous invocation of his right to counsel. (*Suff*, *supra*, 58 Cal.4th at p. 1068.) "[D]efendant did not state that he would speak to the detectives without the assistance of counsel only if he would not be charged with the crimes. [H]is statement concerning counsel was ambiguous and conditional, and did not constitute an invocation of his right to counsel. He cannot avoid the rule of *Davis* ... by characterizing an ambiguous reference to counsel as a limitation on his waiver of his *Miranda* rights." (*Id.* at p. 1070.)

*Suff* also rejected the defendant's claim that his statements were involuntary because the interrogating officers knew at the beginning of the interview that there was

incriminating evidence against him, and failed to tell him. "There is no requirement that, before a person may validly waive his privilege against self-incrimination, he must be apprised of the evidence against him, the 'severity of his predicament,' or the chances he will be charged." (*Suff*, *supra*, 58 Cal.4th at p. 1070.)[17]

In *People v. McCurdy* (2014) 59 Cal.4th 1063, the defendant acknowledged his *Miranda* rights and then said he didn't know why, but " '[t]hey always tell you get a lawyer.' " (*Id.* at p. 1087.) The court held the defendant did not make an unambiguous invocation. "A reasonable officer in these circumstances could have concluded that defendant was expressing *the abstract idea an attorney might be in his best interest*, but he did not actually request one. Although officers may seek clarification of an ambiguous request, they are not required to do so. [Citation.] Moreover, when Deputy Ackerman told defendant the officers could not advise him what to do, defendant continued to speak with them. Accordingly, defendant's further continuation of the conversation supports the conclusion that he did not intend his comment about getting a lawyer to be an invocation of his right to counsel." (*Ibid.*, italics added.) The court further held that the deputy's statements to the defendant, that " 'we're trying to help you,' " and " 'our motivation is not to give you grief or punishment,' " were not coercive and did not render his statements involuntary. (*Id.* at p. 1088.)

In *People v. Cunningham*, *supra*, 61 Cal.4th 609, the defendant admitted he committed a robbery and said, " 'Should I have somebody here talking for me, is this the way it's supposed to be?' " The court held his "vague question did not qualify as an unequivocal invocation of the right to counsel requiring the cessation of questioning."

---

[17] Justice Liu filed a concurring opinion and wrote that the defendant's statements constituted an invocation of his right to counsel, the officer actively misled the defendant because she knew of incriminating evidence against him, and his subsequent statements were involuntary. However, Justice Liu would have found the *Miranda* violation was harmless beyond a reasonable doubt based on the other evidence of the defendant's guilt. (*Suff*, *supra*, 58 Cal.4th at pp. 1079–1080 (conc. opn. of Liu, J.).)

(*Id*. at p. 645.) "At most, a reasonable officer could have understood defendant's inquiry as an indication he *might* want an attorney, in which case the detectives still would not have been required to terminate the interrogation." (*Id*. at p. 646, italics in original.)

### G. Analysis

When Detective Hickman interviewed defendant on February 28, 2012, defendant had already been advised of the *Miranda* warnings four times, waived his rights and answered questions each time, and never invoked his right to counsel.

When defendant told Detective Hickman that he was "sorta in the dark," and he didn't "even have a lawyer," he did not make a clear and unambiguous statement that he wanted an attorney. He had been in custody for almost four days, and a reasonable officer would have interpreted defendant's statement as an inquiry about his first court appearance and what charges would be filed against him. Hickman told defendant that he would get a lawyer at the arraignment, and he thought it was set for that afternoon or within a couple of days.

Detective Hickman's explanation that he would get an attorney at his arraignment was not inappropriate or coercive. "… *Miranda* does not require that attorneys be producible on call, but only that the suspect be informed … that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one. The Court in *Miranda* emphasized that it was not suggesting that 'each police station must have a "station house lawyer" present at all times to advise prisoners.' [Citation.] If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel." (*Duckworth v. Eagan* (1989) 492 U.S. 195, 203–204 [informing defendant that attorney would be appointed " 'if and when you go to court' " accurately described that state's procedure for appointment of counsel], fn. omitted.) "While the police *could* have informed defendant he was free to contact the public defender's office prior to his arraignment, 'we have never read the Constitution to require that the police supply a

suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.' [Citation.] Rather, 'full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process ....' [Citation.] The *Miranda* rules do not also require the police to keep a suspect abreast of his various options for legal representation." (*People v. Bradford*, *supra*, 14 Cal.4th at pp. 1045−1046, italics in original.)

In contrast to *People v. Smith*, *supra*, 40 Cal.4th 483, Detective Hickman did not make any statements that could have been considered misleading about when his arraignment would occur, and when counsel would be appointed to represent him. (*Id*. at pp. 503−504.) Instead, he told defendant that he would likely be arraigned that afternoon, which meant he would get an attorney within a few hours.

Defendant's next statement was equally ambiguous: "I'd like some advice before I … move forward." Defendant did not specify exactly who he wanted advice from, and again failed to unambiguously ask to receive advice from an attorney. As in *Simons*, *supra*, 155 Cal.App.4th at p. 958, Detective Hickman's response − to encourage defendant to tell the truth − was not inappropriate or coercive. Hickman testified he made these statements to defendant as he and his colleague gathered their materials and were about to walk out of the interview area (the nurse's station at the jail). Despite receiving information about the imminent timing of his arraignment, and seeing that the detectives were about to walk away, defendant continued talking. Based on the recording and transcript of the interview, it is undisputed that defendant was the first person who brought up the subject of "lumping all the cases together," and said he wanted to avoid multiple trials and get a single disposition for the numerous robberies he had committed. The detectives did not raise the topic or offer to make any deals. Instead, Hickman continued to urge defendant to tell the truth.

61.

Defendant argues that his separate statements must be considered together – that he did not have an attorney and he wanted some advice from an attorney before he moved forward. Even if these separate statements were considered together, defendant still failed to make an unequivocal request for an attorney. His statements were just as ambiguous as the statements found insufficient invocations in *People v. Bacon*, *supra*, 50 Cal.4th at page 1106, where the defendant said it would probably be a " 'good idea … for me to get an attorney' ", and *Sauceda-Contreras*, *supra*, 55 Cal.4th at pages 214 through 215, where the defendant said, " 'If you can bring me a lawyer … that way I can tell you everything that I know and everything that I need to tell you and someone to represent me.' " Defendant's reference to wanting advice, without clarifying who he wanted advice from, was far more vague than the statements rejected in *Suff*, *supra*, 58 Cal.4th at page 1067, where the suspect said he needed a lawyer if he was being charged.

Defendant asserts that his statements to Detective Hickman on February 28, 2012, must be considered in context with his statements to Sergeant Saso on February 27, 2012. As explained above, Saso met with defendant about the Kern County robberies. By the time he met with Saso, defendant had already received *Miranda* warnings twice on February 25, 2012. When Saso met him, he advised defendant of the *Miranda* warnings and asked if he wanted to talk to him. Defendant said yes. Defendant told Saso that he had a question:

> "[Defendant]:      Like, how soon do I get to speak to an attorney? I (inaudible) from (inaudible)—
>
> "Det. Saso:      From what it looks like when I called this morning; I didn't know if you'd be arraigned today or tomorrow.
>
> "[Defendant]:      Uh-huh.
>
> "Det. Saso:      It sounds like you're going to be arraigned tomorrow. Within 48 hours from the time of your arrest, excluding holidays and weekends. So—

"[Defendant]:        Yeah—

"Det. Saso:        Tomorrow would be—

"[Defendant]:        Tomorrow."[18]

Defendant asserts this exchange places "further context" to his later statements to Detective Hickman, and that he wanted to get advice from an attorney before he continued to answer questions. There are several problems with defendant's reliance on his statements to Sergeant Saso. We first note that at the preliminary hearing, when the court considered defendant's motion to suppress his confession to Detective Hickman, his arguments were limited to whether he invoked his right to counsel when Hickman began the interview on February 28, 2012. During the course of that hearing and at trial, defendant demonstrated his knowledge of exactly what he said to various officers after he was arrested. He never argued that his statements to Saso were inadmissible because of a *Miranda* violation, or that he had asked for an attorney during the Saso interview.

We also note that in determining whether a suspect has invoked his right to counsel, the reviewing court " 'must ask whether, in light of the circumstances, a reasonable officer would have understood a defendant's reference to an attorney to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel, and with no further requirement imposed upon the officers to ask clarifying questions of the defendant.' " (*People v. Cunningham*, *supra*, 61 Cal.4th at pp. 645–646, citing *Davis*, *supra*, 512 U.S. at p. 459.) Defendant's argument improperly focuses on his subjective belief rather than whether a reasonable officer would have understood his statements as an unequivocal and unambiguous request for an attorney. As defendant has pointed out,

_____

**18** After this exchange, defendant and Sergeant Saso talked generally about the crimes, and defendant asked Saso to turn off the tape recorder. Defendant then confessed to the Kern County robberies. Saso turned on the recorder, again advised defendant of the *Miranda* warnings, and defendant gave a full confession to the crimes.

63.

when Detective Hickman interviewed defendant on February 28, 2012, he did not know about the details of defendant's conversation with Sergeant Saso the previous day.

Even if defendant had preserved an objection regarding his statements to Sergeant Saso, and if Detective Hickman knew about his statements to Saso, the entirety of these statements still fail to constitute an unambiguous invocation of the right to counsel. Defendant simply asked Saso how soon would an attorney be appointed to represent him. Saso told defendant that an attorney would be appointed with 24 to 48 hours. Despite this information, defendant did not ask for an attorney and kept talking to Saso. The next day, Hickman told defendant that he was probably going to be arraigned that afternoon. Hickman's statement was consistent with the information given by Saso. Defendant thus knew that the appointment of counsel was imminent, but he never made an unequivocal request for an attorney, he still decided to talk to Hickman, and he independently brought up the issue of "lumping" his cases together.

We thus conclude that defendant did not unambiguously invoked the right to counsel and the court properly denied his motion to "suppress" his confession to the Stanislaus County crimes.

## V.    Defendant's Motion to Exclude Evidence From His Cell Phone

In the midst of trial, defendant moved to exclude all evidence regarding his cell phone. He claimed the chain of custody was not established, and Detective Munoz asked for his cell phone number prior to advising him of the *Miranda* warnings at his first interview on February 25, 2012. The court conducted an evidentiary hearing on defendant's objections pursuant to Evidence Code section 402, denied his motion, and held the cell phone evidence was admissible.

Defendant contends the court erroneously denied the motion and all evidence about his cell phone should have been excluded because there was no evidence on the chain of custody, and Detective Munoz asked for his cell phone number prior to giving him the *Miranda* warnings. As we will explain, any error is necessarily harmless.

64.

## A.  Initial Trial Evidence About the Cell Phone

As set forth in the factual summary, *ante*, the trial evidence revealed that defendant was arrested in Fresno on the outstanding warrant at 5:00 a.m. on February 25, 2012.  At 7:00 a.m., Officer Peterson picked up defendant in Fresno and drove him to the Modesto Police Department.  Detective Munoz testified at trial that when Peterson and defendant arrived in Modesto, defendant was taken to an interview room.  Peterson gave Munoz a manila envelope, and said the envelope contained defendant's property.  Munoz testified the envelope contained a T-Mobile smartphone.  Munoz booked the cell phone into evidence by writing down the serial number on the back of the device, and placing an evidence sticker on it.

Detective Munoz testified that he contacted defendant in the interview room at 10:00 a.m.  He asked defendant for identification information, including his address, former addresses, phone numbers, and employment.  Defendant gave his cell phone number.  Munoz then advised defendant of the *Miranda* warnings.  Defendant waived his rights, answered questions, and gave alibis for the robberies.

## B.  Defendant Objects to the Cell Phone Evidence

After Detective Munoz's trial testimony, defendant objected to the prosecution's efforts to introduce any evidence regarding his cell phone.  The prosecution was going to introduce evidence that a warrant was obtained to search the cell phone, and the forensic search revealed incriminating information about Internet searches and that the cell phone connected to towers near the robbery locations.

Even though the cell phone was searched pursuant to a warrant, defendant argued the police illegally obtained his cell phone number when Detective Munoz asked him for that information prior to advising him of the *Miranda* warnings during the February 25, 2012, interview.  Defendant also challenged the chain of custody for the cell phone.  Defendant asserted that any evidence extracted from the cell phone pursuant to the warrant should be excluded as fruit of the poisonous tree.

65.

After an extended discussion as to whether this issue had been addressed at the preliminary hearing,[19] the court decided to conduct an Evidence Code section 402 hearing on the admissibility of the cell phone.[20]

## C. <u>Evidentiary Hearing</u>

At the evidentiary hearing, Detective Munoz repeated his testimony about how he obtained defendant's cell phone. Munoz testified that after defendant was arrested, Officer Peterson drove defendant from Fresno to Modesto. Peterson gave a bag to Munoz and it contained the cell phone. Munoz booked the cell phone into evidence.

---

[19] As explained in issues II and III, *ante*, the court addressed defendant's motion to "suppress" his February 28, 2012, confession at the preliminary hearing. As part of the preliminary hearing, Detective Munoz testified about his initial interrogation on February 25, 2012, shortly after defendant was arrested. Munoz testified he asked defendant a series of background questions before advising him of the *Miranda* warnings, including what kind of car he drove. Munoz testified that when he asked this question, he knew defendant had just been arrested while driving a black Honda, and the robbery witnesses identified the license plate for that same car as the suspect's vehicle. Defendant did not raise a *Miranda* objection to his statements about the car. At the conclusion of the preliminary hearing, however, the court held that in determining whether defendant should be held to answer, it would not consider defendant's statements about his car because those statements were made in response to pre-*Miranda* questions. The court noted that decision would not affect whether it held defendant to answer, since the witnesses' identified defendant's license plate on the car used in the robberies.

[20] On appeal, the People assert the trial court erroneously considered defendant's objections and conducted the evidentiary hearing on the admissibility of the cell phone evidence. The People argue that he forfeited this argument by failing to raise the issue at the preliminary hearing, when the court considered his *Miranda* objections, and failing to file a motion in limine at the beginning of trial. As we discussed in issue II, *ante*, when defendant objected to the cell phone evidence during trial, the prosecutor eventually conceded that she had previously advised defendant that she would not try to introduce his pre-*Miranda* statements to Detective Munoz, and the admissibility of his statements about his cell phone number were not addressed at the preliminary hearing on his other *Miranda* objections. The prosecutor further conceded that defendant was entitled to an evidentiary hearing on the admissibility of his pre-*Miranda* statement about his cell phone number. We thus conclude the trial court correctly addressed this issue, and defendant has preserved appellate review of his contentions about the cell phone.

Detective Munoz testified that he met with defendant shortly after receiving the cell phone from Officer Peterson. Munoz did not begin the interview by advising defendant of the *Miranda* warnings. Instead, he asked defendant for his parents' names, his address, health information, height, weight, birthdate, cell phone number, what kind of cell phone he had, employment information, and what kind of car he drove. Munoz asked defendant these questions because he did not have a lot of information about him, and he wanted to "build a rapport." Munoz might have had the cell phone in the room during the interview, but he was not sure. Munoz did not know that a cell phone was used in the robberies or his questions would elicit incriminating responses.

Detective Munoz testified the booking sheet did not have a space for an arrestee's telephone number, but there was such a space on the "Pre-booking Probable Cause Declaration Form for the Stanislaus County Jail."

The trial court denied defendant's objections to the admission of evidence about his cell phone. The court stated that Detective Munoz's pre-*Miranda* question about his cell phone number was an appropriate booking question, similar to asking someone for their address, and Munoz did not know that a cell phone was important to the case.

### D. <u>Analysis</u>

It is undisputed that a search warrant was obtained to extract forensic information from the cell phone. Defendant has not challenged the validity of that warrant. However, he contends the court should have excluded all evidence about the cell phone, even though a warrant was obtained for the forensic search, because Officer Peterson never testified about the chain of custody, Detective Munoz obtained the cell phone number prior to advising him of the *Miranda* warnings, and the warrant was the fruit of the poisonous tree.

"In a chain of custody claim, ' "[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been

67.

altered, it is reasonably certain that there was no alteration.  [¶]  The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received.  Left to such speculation the court must exclude the evidence.  [Citations.]  Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." [Citations.]' " (*People v. Catlin* (2001) 26 Cal.4th 81, 134.)  " 'While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering' " (*Ibid.*)

"[I]t is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case.  [N]ot … everyone who laid hands on the evidence must be called.  '[G]aps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.' " (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 311, fn. 1.)

The court properly denied defendant's objections to the chain of custody.  While Officer Peterson did not testify at trial or the evidentiary hearing, any gap in the chain was relevant to the weight rather than the admissibility of the cell phone.  Detective Munoz testified he received the cell phone from Peterson, who transported defendant from Fresno to Modesto after his arrest.  The cell phone was in the container designated with defendant's personal property.  Munoz testified he booked the cell phone into evidence, and Detective Fisher testified he retrieved the cell phone from the evidence room when he prepared the search warrant.

Having found sufficient evidence for the chain of custody, we also reject defendant's claim that the information extracted from the cell phone should have been excluded as the product of the alleged *Miranda* violation when Detective Munoz asked

for his cell phone number on February 25, 2012, before advising him of the *Miranda* warnings. "Under the inevitable discovery doctrine, illegally seized evidence may be used where it would have been discovered by the police through lawful means. As the United States Supreme Court has explained, the doctrine 'is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.' [Citation.] The purpose of the inevitable discovery rule is to prevent the setting aside of convictions that would have been obtained without police misconduct. [Citation.] The burden of establishing that illegally seized evidence is admissible under the rule rests upon the government." (*People v. Robles* (2000) 23 Cal.4th 789, 800–801, fn. omitted.)

Assuming, without deciding that Detective Munoz should have advised defendant of the *Miranda* warnings prior to asking for his cell phone number, we find any error necessarily harmless. The police lawfully obtained the cell phone after defendant was arrested, and obtained a warrant to search the device and extract information from it. Munoz testified he ran an Internet search for information about defendant before he was arrested, and obtained addressed and telephone numbers for him. Detective Fisher testified he relied on the Internet search information to prepare the search warrant for the cell phone. The officers also had the cell phone's serial number, obtained from the back of the device. There is no evidence that defendant's response to Munoz's pre-*Miranda* question about his cell phone number was the critical piece of information required to recover or search the device.

## VI.    Defendant's Complaints About a Juror

Defendant asserts the trial court abused its discretion because it failed to properly investigate an allegation of juror misconduct, based on defendant's complaints that a juror was sleeping.

69.

## A. **Background**

When the court convened the seventh day of trial, defendant advised the court that a juror had been sleeping.

"[DEFENDANT]:   First of all, the defense would like to move for a mistrial immediately on the grounds that juror No. 12 has been caught asleep on more than one occasion.  We don't know what she missed or what its value was.  It could be highly important to the outcome of the case.

"THE COURT:       Okay.  Do you have an offer of proof as to who's been catching her asleep?

"[DEFENDANT]:   I caught her once.  I think Mr. Jacobson [the investigator] caught her, Deputy Negly [the bailiff] caught her yesterday as well.

"THE COURT:       I don't know she's actually been sleeping and she's closing her eyes.  Deputy Negly pushing her or waking her up.  I don't know.  I don't know whether she's actually sleeping or not.  [¶]  Ms. Greerty [the prosecutor], anything you want to say?

"[THE PROSECUTOR]:    I think she's actually been quite vocal, at least from where I'm sitting.  She seems to be going along.  I don't know.  I close my eyes when I'm listening quite intently.  I don't think there's been a sufficient showing warranting her being excused.

"THE COURT:       Okay.  The only thing I can recall is that my bailiff did mention yesterday when you asked her, Mr. Lamb, that she had kind of nudged or she had gestured to [the juror] to open her eyes and she did.  [The bailiff] didn't actually touch [the juror].  Went across the room, gestured to open her eyes, and juror responded.  Would that be a fair assessment what we heard yesterday from my bailiff?

"[DEFENDANT]:   I believe so.

"THE COURT:       So all right.  Then at this point I'm going to deny your request, but I am going to keep an eye on her.  We can all keep an eye on her actually."

The court and the parties did not discuss the matter again.

## B.  Analysis

Section 1089 authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is "found to be unable to perform his or her duty."  Such good cause may exist if a juror is sleeping or inattentive.  (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 411; *People v. Bradford* (1997) 15 Cal.4th 1229, 1349; *People v. Bonilla* (2007) 41 Cal.4th 313, 350; *People v. Johnson*, *supra*, 6 Cal.4th at p. 21, overruled on other grounds by *People v. Rogers*, *supra*, 39 Cal.4th at pp. 878–879.)

Once the court is placed on notice that good cause to discharge a juror may exist, "it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged."  (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.) " 'A juror's inability to perform ... must appear in the record as a "demonstrable reality" and bias may not be presumed.' "  (*People v. Beeler* (1995) 9 Cal.4th 953, 975.)  "A juror must not be discharged for sleeping unless there is convincing proof the juror actually slept during trial."  (*People v. Bowers* (2001) 87 Cal.App.4th 722, 731.)

Both the scope of the court's inquiry and the ultimate decision whether to retain or discharge a juror are committed to the sound discretion of the trial court.  (*People v. Bonilla, supra,* 41 Cal.4th at p. 350.)  If any substantial evidence exists to support the trial court's exercise of its discretion under section 1089, the court's action will be upheld on appeal.  (*People v. Bradford, supra,* 15 Cal.4th at p. 1351.)

The court has the discretion whether to conduct an evidentiary hearing to resolve factual disputes raised by a claim of juror misconduct.  (*People v. Avila* (2006) 38 Cal.4th 491, 604.)  "[T]he mere suggestion of juror 'inattention' does not require a formal hearing disrupting the trial of a case."  (*People v. Espinoza, supra,* 3 Cal.4th at p. 821.) A trial court's "self-directed inquiry, short of a formal hearing," may be adequate under the state and federal Constitutions where the court is alert to the danger of juror

71.

inattention, closely observes the jurors, and makes specific observations about their demeanors. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1234.)

The court did not abuse its discretion by the nature of its inquiry or its decision not to take further action. The court had noted the matter the previous day and obviously talked to the bailiff. The court disagreed with defendant's claim that the juror was asleep, said it would monitor the entire jury during the lengthy trial, and it was "in the best position to observe" the jurors' demeanors and determine if additional inquiries were required. (*People v. Beeler, supra,* 9 Cal.4th at p. 989, overruled on other grounds in *People v. Pearson* (2013) 56 Cal.4th 393, 462; *People v. Schmeck* (2005) 37 Cal.4th 240, 298, overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 637−643.)

## DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
DETJEN, J.